OPINION
WRIGHT, Justice.
On November 5, 2013, a Pennington County jury found appellant Jedidiah Dean Troxel guilty of three counts of first-degree murder while committing first-degree criminal sexual conduct, Minn.Stat. §§ 609.185(a)(2), 609.342, subd. 1(c), 1(d), l(e)(i) (2014). Following his conviction, the district court sentenced Troxel to life in prison without the possibility of release. Minn.Stat. § 609.185(a). Troxel did not pursue á direct appeal. Instead, he filed a timely petition for postconviction relief, alleging that he is entitled to relief based on *306 three alleged errors committed by the-district court: the exclusion of alternative-perpetrator evidence; the denial of a lesser-included-offense instruction on second-degree intentional murder; and the denial of Troxel’s motion , to remove the trial judge for an appearance of partiality. The postconviction court denied relief on all grounds,[1] and Troxel appealed. - For the reasons addressed below, we affirm.
I.
Shortly before noon, on Sunday, August 26, 2012, a fisherman found the body of T.E, near Smiley Bridge, about six miles from Thief River Falls. The victim had 37 stab wounds, primarily to her chest and neck, and one incision wound across her neck. The victim also had sustained blunt-force trauma to her head and face, abrasions to her neck and shoulders, bruises on her left hand and right arm, bruises on her inner thighs, and an abrasion on her upper-inner right thigh next to her external' genitalia. The victim bled to death from her injuries. -
The victim attended a party at' the home of a friend, B.M., on the night-before'and the morning of the murder. ' Troxel was present at this party. Some attendees of the party, including the victim, played a game that involved removing clothing. During the game, the victim removed her shirt and bra. The victim also grabbed and rubbed Troxel’s leg and B.M.’s leg. Troxél told police that the victim rubbed his butt, tried to rub or grab his crotch, and expressed her desire to perform oral sex on him.
The party began to break up around 6:00 a.m. on August 25, 2012. As the party was ending, one witness saw Troxel putting on and lacing black boots. When another witness left the party around 6:00 a.m., she saw the victim outside talking with Troxel, while the victim was standing next to the driver’s side of Troxel’s car. Troxel told police that he left the party around 6:00 a.m. and drove home alone. He also said that the victim left about five minutes before he left. Troxel denied that the victim ever'entered his car, denied that the victim spoke to him outside his car after the party ended, and denied having sex with the victim. Troxel also denied wearing his black boots on both the night before and the morning of the murder. Instead, according to Troxel, he wore red tennis shoes and left his black.boots at home.
On August 25, 2012, at about 7:10 a.m., a local resident saw a car parked on a gravel road near Smiley Bridge. The resident, who had 15 years of experience doing body work on cars, thought the vehicle-was a Mitsubishi Eclipse. Troxel’s car was a 1997 Mitsubishi Eclipse. The victim’s body was found near Smiley Bridge shortly before noon on August 26, 2012.
Police investigators recovered semen from vaginal and cervical swabs taken from the victim’s body. The semen from the vaginal swab contained a single-source DNA profile that matched Troxel. The semen from the cervical swab contained a mixture of DNA. The predominant DNA profile matched Troxel, although the victim’s husband could not be excluded as a contributor to a minor DNA profile.
Police also recovered , blood on Troxel’s shirt and in Troxel’s car on the driver-side door handle and on the .gear shift. The blood on Troxel’s shirt and on the gear shift contained a single-source DNA profile that matched the victim’s DNA. The blood on the door handle contained a mixture of DNA from which 99.7% of the *307 world’s population could be excluded, but the victim’s DNA could not be excluded. Police also found the victim’s fingerprint on the exterior passenger window of Trox-el’s car.
In addition, police found footwear impressions in the mud next to the victim’s body. The brand logo in one impression was similar to that on a pair of black boots, with damp mud on them, that investigators found in Troxel’s bedroom. A surveillance camera at a liquor store recorded Troxél wearing black boots on the night before the murder; And a witness saw Troxel wearing black boots on the morning of the murder.
A Pennington County grand jury indicted Troxel on three counts of first-degree murder while committing a first-degree criminal sexual assault. Troxel sought a for-cause removal of the judge presiding over his trial because the judge was negotiating to become a prosecutor in a neighboring county. The Chief Judge of the Ninth Judicial District denied this motion. TrOxel then petitioned the court of appeals for a writ of prohibition, seeking removal of the trial judge. The petition was denied. In re Troxel, No. A13-1965, Order (MinnApp. filed Oct. 25, 2013). Troxel did not file a petition for review with this court.
Before trial, Troxel also moved to introduce alternative-perpetrator evidence pertaining to M.W., who sent the victim sexually explicit text messages on the morning of the murder. The district court denied this motion. Before closing arguments, Troxel sought a jury instruction on the lesser-included offense of second-degree intentional murder, arguing that a rational basis existed to acquit Troxel of the first-degree murder charge because the sexual activity between Troxel and the victim was consensual. The district court declined to give this instruction.
The jury found Troxel guilty of the three' counts of first-degree murder, and the district court sentenced Troxel to life in prison without the possibility of release. Troxel did not file a direct appeal. Rather, Troxel filed a timely petition for post-conviction relief, alleging that (1) the district court erroneously dénied his request to introduce alternative-perpetrator evidence; (2) the district court erroneously denied his request for a lesser-included-offense instruction on second-degree intentional murder; and (3) the trial judge was disqualified for an appearance of partiality under Minnesota Code-, of Judicial Conduct, Rule 2.11(A). The postconviction court denied relief on each ground. This appeal followed.
II.
We first address whether the district court abused its discretion by denying Troxel’s motion to, introduce, alternative-perpetrator evidence. A district court’s denial of a motion to introduce alternative-perpetrator evidence is reviewed for an abuse of" discretion. State v. Jenkins, 782 N.W.2d 211, 224 (Minn.2010).
The due process clauses of both the Minnesota Constitution and the United States Constitution guarantee a defendant’s right to a fair opportunity to defend against criminal charges. U.S. Const, amend. XIV; Minn. Const, art. 1 § 6; Jenkins, 782 N.W.2d at 226; State v. Jones, 678 N.W.2d 14, 15-16 (Minn.2004). This constitutional guarantee includes the right to present evidence that a third party (an “alternative perpetrator”) committed the crime for which the defendant was charged. Jenkins, 782 N.W.2d at 226; Jones, 678 N.W.2d at 15-16. A foundational requirement for the admission of alternative-perpetrator evidence is that such evidence must “inherently conneet[] *308 an alternative perpetrator to the commission of the charged crime regardless of the strength of the State’s case.” Jenkins, 782 N.W.2d at 226.; see Huff v. State, 698 N.W.2d 430, 436 (Minn.2005). This requirement “avoids the . use of bare suspicion and safeguards the [alleged alternative perpetrator]' from indiscriminate use of past differences with the deceased.” Jones, 678 N.W.2d at 16 (quoting State v. Richardson, 670 N.W.2d 267, 280 (Minn.2003)). If the defendant satisfies this foundational requirement, the district court may, consistent with' evidentiary rules, “admit ‘evidence of a motive of the third person, to commit, the crime, threats by the third person, or other miscellaneous facts’ tending to prove the third party committed the crime.” Huff, 698 N.W.2d at 436 (quoting State v. Hawkins, 260 N.W.2d 150, 159 (Minn.1977)).
We apply the harmless-error test to the' erroneous exclusion of alternative-perpetrator evidence. State v. Vance, 714 N.W.2d 428, 437 (Minn.2006). A conviction will stand despite erroneously excluded evidence when the error was harmless beyond a reasonable doubt. State v. Hokanson, 821 N.W.2d 340, 353 (Minn.2012); State v. Post, 512 N.W.2d 99, 102 (Minn.1994), An error is “harmless beyond a reasonable doubt” when, assuming the potential damage of the excluded evidence were fully realized, a reasonable jury “would have reached the same verdict.” Post, 512. N.W.2d at 102. Conversely, if “there is a reasonable possibility that the verdict might have been different if the evidence had been admitted, then the erroneous exclusion of the evidence is prejudicial.” Id.
Troxel filed an offer of proof regarding an alleged alternative perpetrator, M.W. This proffer consisted of two types of evidence: sexually explicit text messages[2] between M.W. and the victim sent early on the morning of the murder and M.W.’s statements to police on the day after the murder. In a police interview, M.W. admitted that he had been texting with the victim during the morning of August 25, 2012. The victim had asked M.W. to pick her up at a friend’s home, where she had been attending a party.. M.W. arrived at the home around 3:45 a.m. After M.W. arrived, the victim texted M.W., asking him to come inside to have a drink. M.W. declined and instead waited outside in his car.' After waiting outside for about an hour, M.W. got tired, drove back home, and went to bed with his wife. M.W. never saw the victim come outside.
The district court excluded the alternative-perpetrator evidence, concluding that Troxel had failed to establish the foundational requirement that the evidence demonstrate “an inherent tendency to connect M.W. with the commission of the crime.” The district court explained that the offer of proof was “perhaps even less compelling than what was presented in the Jenkins case [782 N.W.2d 211, 228 (Minn.2010) ] as [Troxel] has not established M.W.’s presence at the scene of the crime, let alone a connection to his actual commission of the charged offensefs].”
We have consistently held that “mere presence” at a crime scene, without more, is insufficient to establish,an “inherent connection” to the commission of a crime. Jenkins, 782 N.W.2d at 226; see, e.g., id. at 226-27 (stating that “the [offer of proof] at most established that [the *309 alleged alternative perpetrator] was present [at the crime scene] at some point on the night of the charged crime” but not that he “was present at the ... time of thé crime”). Similarly, an alternative perpetrator’s mere communication with the victim near the time of the crime, without more, lacks sufficient evidentiary foundation. See State v. Williams, 593 N.W.2d 227, 234 (Minn.1999); State v. Harris, 560 N.W.2d 672, 680 (Minn.1997).
Here, the evidence proffered by Troxel does not even establish “mere presence.” There is no evidence that M.W. was at or near the crime scene — Smiley Bridge— when the murder occurred. Rather, the proffered evidence merely shows that, earlier that morning, M.W. and the victim communicated by text message at a different location, the party at B.M.’s home. M.W.’s mere communication with the victim on the same day of the murder is insufficient to satisfy our foundational requirement. See, e.g., Williams, 593 N.W.2d at 234 (“While there was some evidence that [the alleged alternative perpetrator] may have placed telephone calls to [the victim’s] house on the day of the murder, .Williams offered no evidence placing [the alleged alternative, perpetrator] at or near [the victim’s] house on the night of the murder.”); Harris, 560 N.W.2d at 680 (“The only direct connection between [the alleged alternative perpetrator] and [the victim] on the. night of her murder was that witnesses saw them talking outside of a bar after closing”).
Although the text messages between M.W. and the victim were sexually explicit, and suggest a desire to have sex and to “go 4 a drive” on the morning of the murder, this evidence does not inherently connect M.W. to the victim’s murder. Troxel argues that M.W.’s sexually explicit messages, and his unfulfilled quest to have a sexual rendezvous with the victim, established a motive for- M.W., as a “spurned potential lover,” to rape and .kill the victim. There is limited, if. any, probative value in the .'-argument that M.W.’s sexual desire created a motive to rape and kill, absent any overt indication of violence, threats, anger, jealousy, or frustration (beyond the fact that a proposed rendezvous did not occur). Even if we assume that. M.W. had a potential, motive to rape and kill, any such purported motive fails to inherently connect M.W. to the commission of the victim’s murder at the time and-place that it occurred. “Evidence of motive alone does not have the inherent tendency to connect a third party to the commission of the crime.” State v. Larson, 787 N.W.2d 592, 598 (Minn.2010).
In addition to this purported motive, Troxel argues that M.W. had an “opportunity” to kill the victim because “no one can attest to '[M.W.’s] whereabouts after he sat outside [B.M.’s home]” waiting for the victim. M.W. told police that he drove back home and went to bed with his wife. Troxel. dismisses this alibi because ' the source of this evidence was M.W.’s “self-serving statements” to police. But even if M.W. had not made a statement and his whereabouts were completely unknown, the lack of an alibi does not establish sufficient foundation to present alternative-perpetrator evidence. The defendant must proffer foundational evidence that inherently connects the alleged. alternative perpetrator to the commission of the crime. Mere speculation is insufficient. See State v. Nissalke, 801 N.W.2d 82, 102 (Minn.2011) (“[B]are assertions as to what could have happened are not evidence and do not have an ‘inherent tendency[5] to connect [the alleged alternative perpetrators] to the crime.”).
The totality of Troxel’s proffered evidence, including M.W.’s presence near the party, the communication with the vie- *310 tim by text message, the purported motive as a “spurned potential lover,” and the purported “opportunity” to commit the crime based on the absence of- a confirmed alibi, is insufficient to satisfy the foundational requirement establishing M.W.’s inherent connection to the victim’s murder. Because Troxel failed to present foundational evidence that inherently connected M.W. to the commission of the murder, the district court did not abuse its discretion by denying -Troxel’s motion to introduce alternative-perpétrator evidence.
III.
We next consider whether the district court abused its discretion by denying a jury instruction on the lesser-included offense of second-degree intentional murder. “We review a district court’s denial of a lesser-included offense instruction for abuse of discretion.” State v. Van Keuren, 759 N.W.2d 36, 39 (Minn.2008).
It is well-established that, when “the evidence warrants a lesser-included offense instruction, the trial court must give it.” State v. Dahlin, 695 N.W.2d 588, 597 (Minn.2005) (Dahlin I). A lesser-included offense instruction is warranted when (1) the lesser offense is included in the charged offense; (2) the evidence provides a rational basis for acquitting the defendant of the charged offense; arid (3) the evidence provides a rational basis for convicting the defendant of the lesser-included offense. Id. at 595 (citing State v. Leinweber, 303 Minn. 414, 422, 228 N.W.2d 120, 125-26 (1975)). When determining whether to provide a lesser-included-offense instruction, a district court views the evidence in the light most favorable to the party requesting the instruction. ’ Id. at 596. The district court “may not weigh the evidence or make credibility determinations” because those tasks are reserved for the jury. Id. at 596-98.
Unless the defendant was prejudiced by the district court’s erroneous denial of a lesser-included-offense instruction, we will not reverse. Id. at 598-99. To determine whether the defendant was prejudiced, an appellate court “should consider the instructions actually given and the verdict rendered by the jury.” Id. A defendant is prejudiced when the jury may have convicted the defendant of only the lesser offense had the lesser-included-offense instruction been given. Id. at 599 & n. 2.
In Dahlin I, we reviewed the denial of lesser-included-offense instructions on second-degree intentional murder and second-degree unintentional felony murder. 695 N.W.2d at 599. We began our analysis by determining the elements that distinguished the charged offense (first-degree murder) from the lesser second-degree murder offenses, including the elements of intent and premeditation. See id. at 599-601. We held that, when the evidence was viewed in the light most favorable to the defendant, the trial court “abused its discretion in determining that no rational basis existed in the evidence for the jury to find that [the defendant killed the victim] without premeditation.” Id. at 601.
Here, the element distinguishing the instructions on first-degree premeditated murder and the requested instructions on second-degree intentional murder was forced sexual penetration. Compare Minn. Stat. § 609.185(a)(2) (providing that a person is guilty of first-degree-murder if that person “causes the death of a human being while committing or attempting to commit criminal sexual conduct in the first or second degree with force or violence”), and MinmStat. § 609.342, subd. 1(c), 1(d), l(e)(i) (providing that a person is guilty-of criminal sexual- conduct in the first degree *311 if that person engages in sexual penetration, by use of force or coercion, by causing reasonable fear of imminent great bodily harm,. or by use of a dangerous weapon), with Minn. Stat. •§ 609, 19, subd. 1(1) (2014) (providing that a personas guilty of second-degree intentional murder if.-that person “causes-the death of a human being-with intent to effect the death of that person”).
There was clearly a rational basis •to conclude that Troxel committed the second-degree intentional murder. The intent to take the victim’s life was established by stabbing her 37 times. Therefore, we focus our analysis on whether, as the parties frame the question, there also was a rational basis for the jury to acquit on the first-degree murder charges by finding that the victim “consented” to ■Troxel’s sexual penetration, that is, Troxel sexually penetrated the victim -without causing a reasonable fear of imminent great bodily harm, without force or coercion, and without the use of a dangerous weapon. See Minn.Stat. §§ 609.185(a)(2), 609.342, subd. 1(c), 1(d), l(e)(i).
Even when viewing the evidence in the light most favorable to Troxel, the evidence did not present a rational basis to conclude that Troxel’s sexual penetration of the victim-was consensual. The “light most favorable” standard does not preclude the consideration of undisputed physical evidence when there is no rational basis for the jury to disbelieve such evidence. See State v. Goodloe, 718 N.W.2d 413, 423 & n. 7 (Minn.2006) (“While it is theoretically possible that the jury could have believed all of the state’s evidence except the evidence relevant to premeditation, we cannot discern any rational basis for the jury to have done so.”). The physical evidence indicates that Troxel raped the -victim. The victim was found nude from the waist down. Her shirt was pushed up around her breasts. And she was lying in a muddy ditch amid tall grass near Smiley Bridge. .Mud covered her legs up to her knees. The forensic examination of the victim’s body produced no evidence that semen had. leaked -from her vagina, which likely would have occurred had the victim stood up or walked around after Troxel deposited his semen. Consequently, the physical evidence demonstrates that the sexual penetration likely occurred in that mud-filled ditch, which is an improbable location for consensual sexual activity. Moreover, the medical examiner observed fresh-appearing bruises on the inner aspects of the victim’s right and left thighs, and a fresh-appearing abrasion on the “upper inner aspect” of her right thigh, next to her external genitalia. See State v. Murphy, 380 N.W.2d 766, 771-72 (Minn.1986) (holding .that there, was “no proof’ that would rationally support a lesser offense of indecent liberties, based on evidence that “clearly supported]” rape, including the absence of clothing, defensive wounds on the victim’s hands, and other injuries). Thus, the placement, position, and condition of the victim’s body were inconsistent with consensual sexual activity.
This physical evidence regarding the nature of the victim’s injuries and the lack of semen leakage was established primarily by testimony and exhibits from the State’s medical expert. ' Indeed, this evidence was not disputed. Troxel’s counsel did not cross-examine this expert witness, nor did the defense offer any evidence countering this expert testimony. And Troxel does not now dispute any aspect of .the physical evidence regarding the victim’s -injuries or the absence of semen leakage. . Thus, this undisputed physical evidence may be considered when determining whether a lesser-included-offense instruction was warranted, as there was no rational basis for *312 the jury to have disbelieved it.. Goodloe, 718 N,W.2d at 423 & n. 7.
' Troxel - relies ‘on the following facts’ in support-of his argument "that a rational basis 'existed to find consensual' penetration: the attendees of' the party, including the victim, played a game that involved removing clothing; the victim took off her shirt and bra;- a witness saw the victim touch. Troxel’s leg; Troxel told police that the victim rubbed his butt and tried to rub or grab' his crotch; and Troxel told police’that the victim said' she wanted to'perform oral sex on'him. When considered “in the light most favorable” to Trox-el, Dahlin I, 695 N.W.2d at 594, this evidence merely establishes that, while at the party, the victim was aroused and generally interested in sexual activity. This evidence does not rationally support a finding that, later that morning, the victim consented to Troxel penetrating her vagina with his penis, in a muddy ditch near Smiley Bridge, in a manner that resulted in bruises to her inner thighs and an abrasion next to her genitals. Cf. In re Interest of M.T.S., 129 N.J. 422, 609 A.2d 1266, 1278 (1992) (interpreting a state statute on rape as requiring the factfinder to decide “whether the defendant’s act of penetration was undertaken in circumstances that led the defendant reasonably to believe that the alleged victim had freely given affirmative permission to the specific act of sexual penetration”).
Our conclusion is consistent with our decision in Murphy, 380 N.W.2d at 772. We held in Murphy that, there was “no -proof” of mere sexual contact that would support a conviction of a lesser offense (indecent liberties), based on uncontrovert-ed physical evidence that “clearly supported]” a finding that the defendant raped the victim in an alley. This physical evidence included the absence of clothing, the defensive wounds -present on the victim’s hands, a fractured jaw, and facial injuries. Id. Here, although evidence exists that the victim was sexually interested hr Troxel during, the party, -the record provides no rational basis to conclude that Troxel and the victim engaged in consensual sexual penetration in the muddy ditch near- Smiley Bridge. The undisputed physical evidence clearly supports a finding of rape.
A district court may deny the lesser-included-offense instruction when, the evidence, viewed in the light most favorable to the defendant, -is insufficient to provide a rational basis to acquit on the charged offense and convict on the lesser offense. Dahlin I, 695 N.W.2d at 595. Applying that rule here, even when the record is viewed in the light.most favorable to Trox-el, with all doubts' resolved in- his favor, there is insufficient evidence for a jury to rationally find that the victim consented to the sexual penetration. Therefore, the district court did not abuse its discretion by denying an instruction on the lesser-included offense of second-degree intentional murder:
iv.
We next consider whether the presiding judge at Troxel’s jury trial was disqualified based on an appearance of partiality under the Minnesota Code of Judicial Conduct, Rule 2.11(A). Our review of this issue is .de .novo. In re Jacobs, 802 N.W.2d 748, 750 (Minn.2011); State v. Dorsey, 701 N.W.2d 238, 246 (Minn.2005).
A.
Judge Donald Aandal was assigned on August 28, 2012, to preside over Troxel’s trial in Pennington County District Court, which is in the Ninth Judicial District. Approximately five months later, on January 16, 2013, Judge Aandal issued an order for recusal, which stated:
*313 Whereas this.Court has engaged in employment negotiations with the law firms ;;Drenckhahn & Williams, P.A., Galstad, Jensen & McCann, .P.A., and the Marshall County. Attorney’s . Office, and whereas this Court is therefore-disqualified from hearing cases involving the above-listed entities, it -,is therefore ordered that this Court shall not hear or be assigned. any cases involving those entities.
On September 26, 2013, Troxel filed a motion to remove Judge Aandal for cause based on an appearance of partiality, Minn. R.Crim. P. 26,03, subd. 14(3) (providing that a judge may be removed if “disqualified under the Codé of Judicial Conduct”); Minn. R. Jud. Conduct 2.11(A) (providing that a judge “shall disqualify himself or herself in any proceeding in which the judge’s impartiality might reasonably be questioned”). In support of this motion, Troxel filed an affidavit from his attorneys'that stated, in relevant part, that Judge Aandal was in the “final stages” of negotiations to purchase a law firm in Marshall County and “to be appointed to the Marshall County Attorney’s Office as prosecutor”; Judge Aandal “intended to resign his judgeship” with Pennington County and “take employment with Marshall County on or about January 1, 2014”; “Marshall County and Pennington County are-adjacent and ... 29 miles apart”; “Marshall County and Pennington County law enforcement agencies often share resources and cooperate”; and these agencies, and the county attorney offices, use the services of both the Minnesota Bureau of Criminal Apprehension and th§ Minnesota Attorney General’s Office.
The Chief Judge of , the Ninth Judicial District denied Troxel’s motion to remove Judge Aandal. State v. Troxel, No. 57-CR-12-711 (Minn.Dist.Ct. Oct. 10, 2013). Troxel then filed a petition for a writ of prohibition with the court of appeals. The court of appeals denied the writ of prohibition, concluding that Troxel “has not established that, based on an objective examination of the circumstances, [Judge Aandal’s] impartiality might reasonably be questioned.” In re Troxel, A13-1965, Order at 4 (Minn.App. Oct. 25, 2013). Troxel did not file a petition for review with our court. Troxel’s trial proceeded with Judge Aandal presiding.
B.
Before addressing the merits of Troxel’s judge-removal claim, we first consider whether Troxel forfeited appellate review of this issue when he failed to file a petition for review. In State v. Dahlin, 753 N.W.2d 300 (Minn.2008) (Dahlin II), we held that (1) a party must seek a writ of prohibition from the court of appeals to preserve a peremptory removal issue, id. at 303; and (2) “a party must timely petition this court for review of the denial of a writ of prohibition when -the issue involves the right of peremptory removal,” and a party’s “failure to do so constitutes waiver of further review,” id. at 304-05.
After the court of appeals denied Troxel’s.writ of prohibition, Troxel did not petition for further review by our court. It is unclear whether forfeiture[3] applies here because our decision in Dahlin II addressed peremptory removals, Minn. R.Crim. P. 26.03, subd. 14(4), but Troxel *314 sought a for-cause removal- of Judge Aan-dal, Minn. R.Crim. P. 26.03, subd. 14(3).
In Hooper v. State, 838 N.W.2d 775 (Minn.2013), we declined to resolve whether the Dahlin II forfeiture rule extends to for-cause removal requests. We stated that, “a defendant’s failure to seek a writ of prohibition constitutes waiver of further appellate review ‘when the issue involves the right of peremptory removal,’ However, we have never decided whether the waiver rule extends to' ... removal of a judge for cause.” Id. at 789 n. 4 (citation omitted). We then declined to resolve this forfeiture question because the removal claim failed on its merits. Id.
In State v. Finch, 865 N.W.2d 696, 700-01 (Minn.2015), we held that a defendant is not required to petition for a writ of prohibition to avoid forfeiture of a for-cause judge-removal claim. Thus, Finch confirms that the first aspect of Dahlin II — - that a party is required to petition for-.a writ of prohibition to avoid forfeiture of a peremptory-removal issue — does not extend to for-cause removal requests. But Finch did not resolve the application of the second aspect of Dahlin II — that is, if -a party chooses to petition for a writ of prohibition, and the court of appeals denies the writ, whether the party must file a petition for review with our court to preserve the claim.- Since our decision in Finch, we have not squarely addressed whether this second aspect of the Dahlin II forfeiture rule extends.to-for-cause removal requests. We decline to resolve this forfeiture issue here because Troxel’s judge-removal claim fails on its merits.
C.
A judge “must not preside at a trial or other proceedings if disqualified under the Code of judicial Conduct,” Minn. R.Crim. P. 26.03, subd. 14(3), and a judge “shall disqualify himself or herself in any proceeding in which the judge’s impartiality might reasonably be questioned,” Minn. R. Jud. Conduct 2.11(A). “Impartiality” means the “absence of bias or prejudice in favor of, or against, particular parties or classes of parties, as well as maintenance of an open mind in considering issues.” State v. Pratt, 813 N.W.2d 868, 876 (Minn.2012) (quoting Terminology, -Minnesota Code of Judicial Conduct). A judge is presumed to be “able to ‘approach every aspect of each case with a neutral and objective disposition!’ ” Jacobs, 802 N.W.2d at 754 (quoting Dorsey, 701 N.W.2d at 247). A judge is disqualified for a lack of “impartiality” under Rule 2.11(A) if a “reasonable examiner,” from the perspective of an objective “layperson with full knowledge of the facts and circumstances,” would “question the judge’s impartiality.” Pratt, 813 N.W.2d at 876 & n, 8 (quoting Jacobs, 802 N.W.2d at 753).
In Jacobs, we concluded that a reasonable .examiner would not question a judge’s impartiality based, on his spouse’s employment in the Hennepin County Attorney’s Office (HCAO), even though that office prosecuted the case, because the HCAO handled a high volume and a wide variety of cases; the spouse had no personal involvement in the case; the spouse had no financial interest in the. outcome of the case; and, although the spouse worked for the criminal. appellate division of the HCAO at one time, the spouse worked for a different division of the HCAO at the time of trial. 802 N.W.2d at 753.
Conversely, in Pratt, we concluded that a reasonable examiner would question a judge’s impartiality because the judge was retained-to provide expert-witness services in a civil trial for the HCAO, while presiding at-a trial prosecuted by the HCAO. 813 N.W.2d at 876-77. Pratt is distinguishable from other cases because the judge was “actually retained by the prosecuting *315 authority -at the same time the prosecuting authority was appearing before the judge.” Id. at 878. In addition, “the judge stood to benefit financially from being retained” by the HCAO, and as an expert witness for HCAO, the judge “was to act in a way that was aligned with, the HCAO’s interests,,” Id. at 877.
Here, unlike in Pratt, Judge Aan-dal was not retained by the Pennington County Attorney’s Office (PCAO); he was not expected to act in a way that was aligned with the interests of the PCAO; and he did not stand to benefit financially from the PCAO. Rather, during Troxel’s trial, he was in negotiations to purchase a law firm in Marshall County and work for the Marshall County Attorney’s Office (MCAO).
Troxel cites dicta from Pratt and from several decisions of other jurisdictions to support the general proposition that a judge places impartiality in question by engaging in employment negotiations'for a position as a prosecutor at the time of the trial. See Pratt, 813 N.W.2d at 877-78 (“Some courts have found that merely negotiating for future employment might cause a reasonable observer to question a judge’s .impartiality.”); see also Pepsico, Inc. v. McMillen, 764 F.2d 458, 459-60 (7th Cir.1985); Scott v. United States, 559 A.2d 745, 746-50 (D.C.Cir.1989); DeNike v.. Cupo, 196 N.J. 502, 958 A.2d 446, 449 (2008). These cases are distinguishable. In each of these cases, the judge was employed by, or seeking future employment'with, an entity currently appearing before the judge. Here, by contrast, Judge Aandal was not employed by, or seeking employment with, the PCAO, which was prosecuting Troxel’s case. Nor did the MCAO appear in, or associate with, Troxel’s case. Moreover, our decision in Pratt did not hold that a judge’s mere negotiation for future employment created the appearance of partiality. Rather, we held that the facts of Pratt were “problematic ... because ..: the judge was actually retained by the prosecuting authority.” 813 N.W.2d at 878 (emphasis added).
Troxel also cites law review articles and other secondary sources to support the general propositions that prosecutors must “adopt the role of an advocate” for the government; that prosecutors “would be aligned ... ideologically with other prosecutors; and that an advocácy function is not “consistent with the neutral role” of a judge. Although these propositions are not incorrect, .they do not establish that negotiating to become a prosecutor in the future results in the appearance of a judge becoming an advocate, re-aligning his or her ideology, or departing from a neutral role. No precedent directly supports the argument that a judge is disqualified for an appearance of partiality based solely on employment negotiations with a county attorney’s office when that office is outside the county in which the trial proceeds, that office is not appearing before the judge, and there are no indications that the office has had any involvement or interest in the case,[4] Here, Judge Aandal took all neces *316 sary steps to avoid an appearance of partiality by ordering his own recusal from any cases involving the MCAQ.
Despite Troxel’s assertions that neighboring counties sometimes cooperate, or share resources and services, the Chief Judge of the Ninth Judicial District found that there is no evidence that the MCAO had “any interest in this case or that the outcome would have an- effect upon Judge Aandal’s future employment plans” or that the MCAO “ha[d] any involvement. in [Troxel’s] case.” These findings are supported by the record. Moreover, Troxel has failed to rebut the presumption that Judge Aandal approached “every aspect of [Troxel’s] 'case with a neutral and objective disposition.” See Jacobs, 802 N.W.2d at
754 (quoting Dorsey, 701 N.W.2d at 247). For these reasons, a reasonable and objective- examiner, with full knowledge of the above facts and circumstances, would not question Judge Aandal’s impartiality. Therefore, Judge Aandal whs not disqualified under-Rule 2.11(A)- of the Code of Judicial Conduct.
■V.
For the foregoing reasons, we affirm the postconviction court’s denial of relief on all grounds.
Affirmed.
Dissenting, LILLEHAUG, J., GILDEA, C.J., ANDERSON, J.

. The postconviction court denied the petition without holding an evidentiary hearing because Troxel’s petition explicitly stated that no evidentiary hearing was requested.

, The text messages included, "Y u want me”; “U got me awake and hard”; "Want me 2 come 2 town, then”; “We could go 4 a drive lol”; “How wet r u”; "Hope soon u got me hard as hell”; "Lol whos gona cum 1st”; "Ready 4 that drive”; and “I would have made u lose ur paiitys.”

. Dahlin II used the term "waiver,” 753 N.W.2d at 305, but this court has recently emphasized the distinction between waiver, which refers to the intentional relinquishment of a known right, and forfeiture, which refers to the failure to make a timely assertion of a right. State v. Beaulieu, 859 N,W.2d 275, 278 n"3 (Minn.2015) ("We .. . use the' word 'forfeiture’ "when déscribing a failure to make a timely assertion of a right.”.).

. The dissent contends that a reasonable examiner .would question Judge Aandal’s impartiality .because both the MCAO and PCAO prosecute criminal cases “on behalf of the State" and because "the State” was the party appearing before Judge Aandal in Troxel’s case. Thus, the dissent contends, Judge Aan-dal should have recused "from all other criminal cases ... in which the State was a party.” Under the effect of this broad rule, if a judge seeks .employment with.awy prosecuto-rial entity in the entire.State of Minnesota, that judge would be required to recuse from all criminal cases, regardless of the circumstances, because all.criminal cases are prosecuted on behalf of "the State,” This overly broad application of Rule 2.11(A) is not directly supported by any of our precedent, and *316 in particular, it is inconsistent with Jacobs, in which we held that an appearance of partiality did not arise in a criminal case based on the employment of a judge’s spouse, who worked for "the State” through the HCAO, because the HCAO handled a high volume and a wide variety of cases; the.spouse had no involvement or financial interest in .the outcome of the case; and die spouse, did not work for the criminal appellate division of the HCAO at the time of trial. 802 N.W.2d at 753. Similarly here, the State of Minnesota handles a high volume, and wide variety of (cases and the MCAO had no, involvement or interest in the outcome of Troxel’s case.
Moreover, the dissent’s bright-line rule, requiring recusal from all criminal cases in the State of Minnesota if a judge seeks prosecuto-rial'employment, is inconsistent with our standard for evaluating an appearance of partiality, which' depends on an objective examination of all facts and circumstances of each particular case. Jacobs, 802 N.W.2d at 752 ("Whether a judge’s impartiality may reasonably be questioned is determined by an objective examination into the circumstances sur■rounding the removal request,”). Here, the objective examination of all facts and circumstances related to Troxel’s removal request leads us to conclude that a reasonable examiner, who is fully informed of those facts and circumstances, would not question Judge Aandal’s impartiality. See also id. at 753
(”[T]he appropriate standard for determining whether a judge must be disqualified due to ‘ an appearance of partiality is whether a reasonable examiner, with full knowledge of the facts and circumstances, would question the judge’s impartiality.”).
In response, the dissent contends that "this case is not Jacobs” and cites three factual differences, Nonetheless, other similarities with Jacobs and distinctions from Pratt support our decision. In Pratt, thq facts were problematic because the judge was actually retained by the prosecutorial office that appeared before the judge. 813 N,W.2d at 878. But here, Judge Aandal negotiated for future employment with a different office from the one appearing before him. Moreover, in Jacobs we recognized the significance of different prosecutorial offices and divisions when we stated that, although the judge's spouse had worked as an attorney, in the criminal division of the HCAO — the office appearing before the judge — the spouse’s affiliation became less problematic when she transferred to a separate division of the HCAO before the case was filed. Jacobs, 802 N.W.2d at 753 & n. 1. Here, the distinction is even greater because Judge Aandal never negotiated to join, let alone worked for, any division of the PCAO. Rather, he negotiated to work in the future for a different office, the MCAO. And, as we conclude above, there is no indication that the MCAO- had any involvement or interest in this case.

. The MCAA trains county attorneys and their assistants. Minn. Stat. § 388. 19, subd. 4(a). Further, the county attorneys speak with a unified voice through, for example, amicus briefs and comments on proposed rules of procedure.