STATE OF MINNESOTA

IN SUPREME COURT

A24-0344

Hennepin County

State of Minnesota,

        Respondent,

vs.

Ryan Charles Rooney,

        Appellant.

McKeig, J.
Concurring, Thissen, Procaccini, JJ.

Filed: July 2, 2025
Office of Appellate Courts

_____

Keith Ellison, Attorney General, Saint Paul, Minnesota; and

Mary F. Moriarty, Hennepin County Attorney, Nicole Cornale, Assistant County Attorney, Minneapolis, Minnesota, for respondent.

John T. Daly, Arthur J. Waldon, Lakeville, Minnesota, for appellant.

_____

S Y L L A B U S

1.      The district court did not abuse its discretion when it precluded alternative-perpetrator evidence on the basis that the defendant did not satisfy the foundational requirement to introduce such evidence.

2.      The district court did not err when it denied defendant's motion to suppress his statements to police officers because they were voluntarily made.

Affirmed.

1

MCKEIG, Justice.

After a jury trial, appellant Ryan Charles Rooney was found guilty of first-degree domestic abuse murder and sentenced to life in prison with the possibility of parole. Rooney appeals, seeking a new trial on two grounds. First, Rooney argues that the district court abused its discretion when it precluded Rooney's proffered alternative-perpetrator evidence on the basis that it did not meet the foundational requirement for admitting such evidence. Second, Rooney argues that the district court erred when it denied his motion to suppress, finding that statements Rooney made to police officers at the hospital shortly after he sustained a gunshot wound to the head were voluntarily made. Because we conclude the district court did not err in either ruling, we affirm.

**FACTS**

This appeal arises from the murder of Rooney's wife, Samantha Columbus-Boshey, who was shot in the chest sometime between October 30, 2021, and November 2, 2021. Columbus-Boshey's body was found in a hotel room at the Residence Inn in Eden Prairie, where she and Rooney had been staying for several weeks.

***Events Preceding the Murder Investigation***

Rooney and Columbus-Boshey checked into the Residence Inn on October 13, 2021, along with Columbus-Boshey's two young children. Rooney and Columbus-Boshey used the hotel as a temporary residence. They were assigned room 524, a two-level hotel room. The entrance was on the main level, which had a living area and a bedroom. The upper level had a second bedroom.

2

D.G., a long-time friend of Rooney and Columbus-Boshey, also lived at the Residence Inn with them for part of their stay at the hotel. D.G. met both Rooney and Columbus-Boshey through his uncle but at different times. D.G. and Columbus-Boshey had known each other for "ten-plus years," and they considered themselves best friends. D.G. and Rooney met later, around 2014. Over the years, the three developed a close friendship. In early October 2021, Rooney and Columbus-Boshey bailed D.G. out of jail. D.G. lived with them in the ensuing weeks, sleeping on the couch in the living room. Rooney, Columbus-Boshey, and D.G. used methamphetamine and other controlled substances together in the hotel room. D.G. stayed with them until October 27, 2021, after which he stayed with his ex-girlfriend in Farmington.

Columbus-Boshey was scheduled to check out from the Residence Inn on November 1, 2021. She did not. When housekeeping staff attempted to clean the room, they could not enter because the interior security latch secured the door shut from the inside. Housekeeping staff unsuccessfully attempted to enter the room multiple times throughout the day. A hotel employee called both the hotel landline in room 524 and Columbus-Boshey's cellphone number multiple times but received no answer.

After the failed attempts to access the room and to contact its occupants, hotel staff noted that no guest keycard had been used to enter the room since approximately 3:10 a.m. on October 30, 2021, more than 48 hours earlier.[1] In accordance with hotel policy, the

---

[1]     Rooms at the Residence Inn require an electronic keycard to open them. Rooney, Columbus-Boshey, and D.G. each had keycards to access room 524. The hotel's system electronically recorded when a keycard was used to enter a room. Although the keycard

3

staff extended Columbus-Boshey's stay by one night and reprogrammed the hotel room lock so the guests in the room would need to get a new keycard at the front desk to access the room.

The next day, on November 2, 2021, housekeeping staff again unsuccessfully attempted to enter the room. Eventually, maintenance staff used tools to unlatch the door. After gaining entry, hotel staff heard a toddler cry, saw a baby in a crib, and observed an unresponsive male adult. Hotel staff called the police to conduct a welfare check on the occupants.

When officers arrived, they opened the door to room 524, announced their presence, and stood at the threshold of the door. They heard a man moaning, and they also heard a small child. The officers asked the man to come to the door. Rooney came down the stairs with a small child. The officers noticed an injury to Rooney's temple and blood surrounding his lips and chin. Rooney was shirtless and had blood on the front of his jeans. The officers entered the room with Rooney's consent. They found an infant in a playpen in the main-level bedroom. As the officers walked upstairs, they observed a blood-like substance dripping down the hallway closet door. In the upper-floor bedroom, the officers found Columbus-Boshey's deceased body.

The officers then detained Rooney. They observed that his head injury appeared consistent with a gunshot wound; it entered under his chin and exited through the top of

---

records could not show who used a keycard to enter a room, the records showed whether a guest keycard or a staff keycard was used to open a particular room door.

his skull. The wounds did not appear fresh because the blood around them was dried. Rooney was transported to the hospital to receive treatment for his injuries.

### *Rooney's Statements to Officers at the Hospital*

On November 4, 2021, officers went to the hospital to interview Rooney about Columbus-Boshey's death. Although Rooney had a feeding tube in his nostrils and several medical devices attached to his arm, he was awake, alert, seated, engaged with medical staff, and responsive to staff instructions. Before speaking with the officers, Rooney went for a physical therapy walk with hospital staff. Once Rooney returned to his room, the officers explained that they were there to ask some questions. An officer asked whether Rooney preferred to speak or write his responses; Rooney indicated he preferred to write.

Before beginning the interview, the officers asked Rooney a series of questions to determine whether he could understand them and was aware enough to complete an interview. Rooney accurately wrote the month (and the date, unprompted), his last name, his birthday, and the year, make, and model of his car. The officers were satisfied that Rooney was aware of and able to answer questions, so they began the interview.

The officers explained they were there to discuss what happened at the Residence Inn. They informed Rooney of his *Miranda* rights. When asked if he understood and would talk to the officers, Rooney verbally responded "yes" and wrote "y" on the paper. The interview lasted about one hour and 20 minutes, during which Rooney made several incriminating statements. For example, when the officers asked how Rooney knew Columbus-Boshey was shot, Rooney wrote, "because I've been in the room." Rooney agreed that he and Columbus-Boshey were the only adults in room 524 and that he was the

5

only person who could tell officers what happened.  When asked how Columbus-Boshey was shot, Rooney stated he did not want to tell because he did not want to get himself in trouble.  When asked where he was when Columbus-Boshey was shot, Rooney responded "nowhere."  Rooney also stated, "I don't know why I shot [Columbus-Boshey]."

Throughout the interview, Rooney had periods of time where he kept his eyes closed but still responded to questions.  About 40 minutes into the interview, a nurse entered the room to administer Zofran, an anti-nausea medication, to Rooney.  Following the Zofran administration, Rooney's behavior and appearance remained similar, and he continued to appropriately respond to the officers' questioning.  During the last five minutes, Rooney fell asleep.  The officers ended the interview and left.

On November 5, 2021, the State charged Rooney with second-degree intentional murder, Minn. Stat. § 609.19, subd. 1(1) (2024), and endangerment of a child, Minn. Stat. § 609.378, subd. 1(b)(1) (2024).  A grand jury later indicted Rooney for first-degree murder while committing domestic abuse with a past pattern of domestic abuse, Minn. Stat. § 609.185(a)(6) (2024), and second-degree intentional murder.

***Pretrial Motions***

The parties litigated various pretrial motions.  Two of their pretrial motions are at issue in this appeal: the State's motion to preclude Rooney's proffered alternative-

6

perpetrator evidence and Rooney's motion to suppress statements he made in response to police questioning while he was hospitalized.[2]

Rooney gave notice of an alternative-perpetrator defense. The State moved to preclude Rooney from introducing alternative-perpetrator evidence. Rooney proffered evidence which he alleged connected D.G. to the commission of the crime. The proffered evidence included:

- A statement given by a Residence Inn employee to police officers that described an encounter between a man and woman outside of room 524 on November 1, 2021;
- Testimony about D.G.'s stay at the Residence Inn, including that Rooney and Columbus-Boshey bailed him out of jail on October 3, 2021, D.G. possessed a keycard to the hotel room, and D.G. stayed with them intermittently until October 27, 2021;
- Testimony about D.G.'s knowledge that Rooney had inherited a large sum of money, D.G.'s previous convictions, D.G.'s single romantic encounter with Columbus-Boshey, and D.G.'s history of using controlled substances.

The district court concluded that Rooney failed to meet his burden to show there was evidence having an inherent tendency to connect D.G. with the actual commission of the murder. Accordingly, the district court granted the State's motion to preclude alternative-perpetrator evidence.

Rooney also moved to suppress statements he made after the murder. Relevant to this appeal, Rooney moved to suppress his November 4, 2021 statements to officers while in the intensive care unit at the hospital, arguing he made the statements involuntarily. The

---

[2]    In the motion to suppress, Rooney requested that the district court suppress various other statements he made to medical personnel and police officers after the murder. The district court's ruling regarding the other statements is not at issue in this appeal.

district court denied this motion, concluding that the totality of the circumstances established that Rooney made his statements voluntarily.

### Jury Trial

The case proceeded to a jury trial. The State's evidence included: (1) a loaded semi-automatic firearm with a blood-like substance on it that officers found in room 524, in a gun case speckled with a blood-like substance; (2) DNA on the firearm's barrel, grip, and trigger which was a single profile matching Rooney's DNA; (3) DNA on the firearm's slide which was a mixture of two or more individuals with a major profile matching Rooney's DNA, but not D.G.'s or Columbus-Boshey's DNA; (4) DNA on a bullet recovered from the loft bedroom wall which was a single, female profile matching Columbus-Boshey's DNA; and (5) gunshot residue on Rooney's right hand. The State also offered testimony from a firearms examiner that the two discharged cartridge casings recovered from the scene were consistent with having been fired from the firearm found in the hotel room. After 11 days of trial, the jury found Rooney guilty of first-degree domestic abuse murder and second-degree intentional murder.

Rooney appealed.

## ANALYSIS

### I.

We first address the district court's decision to exclude Rooney's proffered alternative-perpetrator evidence. We review a district court's ruling on alternative-perpetrator evidence for an abuse of discretion. *State v. Woodard*, 942 N.W.2d 137, 141 (Minn. 2020). "A district court abuses its discretion when its decision is based on an

erroneous view of the law or is against logic and the facts in the record." *State v. Hallmark*, 927 N.W.2d 281, 291 (Minn. 2019) (citation omitted) (internal quotation marks omitted). Even if we determine that the district court abused its discretion, we must further find that the error was not harmless beyond a reasonable doubt to reverse the district court's decision. *State v. Westrom*, 6 N.W.3d 145, 155 (Minn. 2024).

The Due Process Clauses of the Minnesota and United States Constitutions guarantee a criminal defendant's right to present a complete defense. Minn. Const. art. I, § 7; U.S. Const. amend. XIV; *see also State v. Carbo*, 6 N.W.3d 114, 123 (Minn. 2024). Included in the right to present a complete defense is the right to introduce evidence that an alternative perpetrator committed the crime. *Carbo*, 6 N.W.3d at 123. A defendant's right to present a complete defense, however, is not absolute. *State v. Jenkins*, 782 N.W.2d 211, 224 (Minn. 2010). A motion to present alternative-perpetrator evidence is subject to the foundation and admissibility requirements we outlined in *State v. Hawkins*, 260 N.W.2d 150, 158–59 (Minn. 1977).

We said in *Hawkins* that district courts should follow a two-step process to determine whether to admit alternative-perpetrator evidence. *Id.* at 159. First, a defendant must make a foundational proffer of "evidence having an inherent tendency to connect [the third person] with the actual commission of the crime." *Id.* (citation omitted) (internal quotation marks omitted). Our task, then, "is to determine whether the evidence, not the assertions, contained in the proffer provides the required" foundation. *Jenkins*, 782 N.W.2d at 228. This foundational requirement avoids "the consideration of matters

collateral to the crime" and "the use of bare suspicion and safeguards the third person from indiscriminate use of past differences with the [victim]." *Hawkins*, 260 N.W.2d at 159.

Second, only if the district court determines this threshold requirement has been met may the defendant introduce "evidence of a motive of the third person to commit the crime, threats by the third person, or other miscellaneous facts which would tend to prove the third person committed the act" if the ordinary rules of evidence are satisfied. *Id.* (footnotes omitted). The purpose of this evidence is to create reasonable doubt that the defendant committed the crime; it is not to prove the guilt of the alternative perpetrator. *State v. Atkinson*, 774 N.W.2d 584, 590 (Minn. 2009).

Rooney argues that the district court violated his constitutional right to present a complete defense by preventing him from presenting evidence that someone else committed the offense. Specifically, he contends that the district court abused its discretion by misinterpreting our case law to impose a threshold requirement for a defendant to produce evidence of the alternative perpetrator's presence at the crime scene. Rooney focuses on two select sentences in the district court order to argue that the district court had an erroneous view of the law.

We disagree with Rooney's reading of the district court order. He reads the order too narrowly. Rather than holding Rooney to the wrong standard, the district court correctly noted how courts consider evidence that an alternative perpetrator was present at the crime scene when conducting a *Hawkins* analysis: An alternative perpetrator's presence at a crime scene is not enough, by itself, to establish an inherent tendency to connect the alternative perpetrator with the offense, nor is it necessary to establish an inherent

10

tendency. *See, e.g.*, *Atkinson*, 774 N.W.2d at 590 (citing *State v. Flores*, 595 N.W.2d 860, 868–69 (Minn. 1999)); *Troxel v. State*, 875 N.W.2d 302, 308–09 (Minn. 2016); *Woodard*, 942 N.W.2d at 142. The lack of evidence of presence at the scene, however, can weigh against finding an inherent connection. *See, e.g.*, *State v. Larson*, 787 N.W.2d 592, 598 (Minn. 2010). In sum, our case law does not *require* evidence of an alternative perpetrator's presence at the crime scene, but district courts may consider the *absence* of such evidence when determining whether a defendant's proffered evidence, taken cumulatively, establishes an inherent tendency to connect the alternative perpetrator with the actual commission of the crime.

Here, the district court correctly observed that Rooney's proffered evidence did not place D.G. at the crime scene at the time Columbus-Boshey's murder occurred. But the district court did not end its analysis there. The district court also considered the other evidence Rooney proffered about D.G. when analyzing whether Rooney satisfied the foundational requirement to introduce alternative perpetrator evidence. The district court also concluded that Rooney's proffered evidence did not suggest that D.G. had a motive to murder Columbus-Boshey. *See Troxel*, 875 N.W.2d at 309 (reasoning that there is little probative value in an argument that the alternative perpetrator's sexual desire creates a motive to kill "absent any overt indication of violence, threats, anger, jealousy, or frustration"). The district court further noted that the proffered description evidence did not tend to connect D.G. with the murder. The Residence Inn employee's statement to police officers that described an encounter between a man and a woman outside of room 524 was too vague to connect D.G. to the murder; the description was of a man who *may*

11

have been D.G. but could also have matched any number of persons. *See Woodard*, 942 N.W.2d at 143 ("Woodard's evidence of [the alternative perpetrator's] physical appearance establishes that [the alternative perpetrator] bears similarities to the description of the shooter, but the description of the shooter is lacking in specificity . . . such that any number of people would match the description.").

After appropriately considering presence, motive, and description evidence, the district court determined that Rooney's proffered evidence did not have the inherent tendency to connect D.G. with the actual commission of Columbus-Boshey's murder.[3] We conclude the district court did not abuse its discretion when it granted the State's motion to preclude alternative-perpetrator evidence but rather reasonably applied our case law to Rooney's proffer.[4]

---

[3]   Finding a connection between D.G. and the murder would have required the district court to rely on Rooney's assertions, not evidence, and our case law explicitly prohibits such reliance. *E.g.*, *State v. Nissalke*, 801 N.W.2d 82, 102 (Minn. 2011) ("[B]are assertions as to what could have happened are not evidence and do not have an 'inherent tendency' to connect [the alleged alternative perpetrators] to the crime."); *Woodard*, 942 N.W.2d at 143 ("The defense's use of a witness statement concerning [the alleged alternative perpetrator's] whereabouts in the period following the murder . . . relies on an assertion in an effort to link [the alleged alternative perpetrator] to the actual commission of the crime."). Before the district court, Rooney theorized that D.G. could have entered the room without registering a keycard swipe on the hotel system if someone had opened it from the inside. Without any evidence proffered to support this theory, it was merely an assertion.

[4]   Even if we had found that the district court abused its discretion in this case, we would not reverse because any error would have been harmless beyond a reasonable doubt. *See, e.g.*, *Westrom*, 6 N.W.3d at 155–56. "If the verdict . . . was surely unattributable to the error, the error is harmless beyond a reasonable doubt. The relevant inquiry in this case is whether a reasonable jury would have reached the same verdict if the evidence had been admitted and the damaging potential of the evidence fully realized." *State v. Blom*, 682 N.W.2d 578, 622 (Minn. 2004) (citation modified). Here, the State's evidence of Rooney's

II.

We next consider Rooney's argument that his post-*Miranda* statements made to officers during an interview on November 4, 2021, at the hospital were not voluntary. When reviewing the denial of a motion to suppress a defendant's statements, we review the district court's legal determination of whether the defendant's statement was voluntary de novo. *State v. Cox*, 884 N.W.2d 400, 408 (Minn. 2016). We accept the district court's underlying factual determinations regarding the circumstances of the interview unless the findings are clearly erroneous. *Id.*

A statement must be voluntary to be admissible at trial. *State v. Riley*, 568 N.W.2d 518, 525 (Minn. 1997); *see also State v. Blom*, 682 N.W.2d 578, 614 (Minn. 2004). The central question when determining if a confession was voluntary is "whether the defendant's will was overborne at the time he confessed." *State v. Ezeka*, 946 N.W.2d 393, 404 (Minn. 2020) (citation omitted) (internal quotation marks omitted). "Our inquiry is not whether 'police actions contributed to the utterance of inculpatory statements,' " but " 'whether [the] actions, together with other circumstances surrounding the interrogation, were so coercive, so manipulative, so overpowering that [the defendant] was deprived of his ability to make an unconstrained and wholly autonomous decision to speak as he did.' "

___

guilt at trial—29 witnesses and over 150 exhibits—was overwhelming, including direct evidence that Rooney repeatedly abused Columbus-Boshey; that Columbus-Boshey wanted to flee with her children from Rooney's abuse; that Rooney's DNA was on the murder weapon's slide, grip, trigger, and barrel; and that Rooney had gunshot residue on his right hand. Given the overwhelming evidence of Rooney's guilt presented in this case, a reasonable jury would have reached the same verdict if the alternative perpetrator evidence had been admitted and its damaging potential was fully realized. Such an error, therefore, would have been harmless beyond a reasonable doubt.

*Id.* (alteration in original) (quoting *State v. Pilcher*, 472 N.W.2d 327, 333 (Minn. 1991)). In applying this test, we consider the totality of the circumstances including factors such as "the defendant's age, maturity, intelligence, education, experience and ability to comprehend; the lack of or adequacy of warnings; the length and legality of the detention; the nature of the interrogation; and whether the defendant was deprived of physical needs or denied access to friends." *Blom*, 682 N.W.2d at 614. (citation omitted) (internal quotation marks omitted).

In its analysis, the district court appropriately considered the totality of the circumstances, including Rooney's age, maturity, intelligence, education, experience, ability to comprehend, and the nature of the interrogation. The district court acknowledged that Rooney was hospitalized for a head wound but noted that he could "stand, walk, follow commands appropriately from hospital staff, and communicate with hospital staff prior to the interview." The district court noted that Rooney was "conscious and ambulatory," and the he was "able to understand, follow commands, respond appropriately to all questions, and communicated as such." The district court concluded that the officers' sympathetic approach and the Zofran Rooney received during their interview at the hospital did not render his statements involuntary. The district court also noted that law enforcement did not use intimidation or threats at any point; to the contrary, one officer adjusted Rooney's feeding tube to make him more comfortable during the one-hour-and-20-minute interview. Based on these and other facts, we conclude Rooney's statements were voluntarily made and thus did not require supression.

Rooney contends that the district court erred because his medical condition, medication, and the officers' interrogation tactics rendered his statements involuntary. Specifically, he argues that when considering the totality of the circumstances, the district court "focused on Rooney's age, intelligence, maturity, and experience with the criminal justice system, as well as the generally low-key and sympathetic conduct of the officers," but its "true focus should have been the nature of the interrogation and Rooney's ability to comprehend." To the contrary, the district court properly considered the totality of the circumstances. The district court has authority to weigh the relevant factors in its totality of the circumstances analysis. It was not required to give more weight to the factors Rooney claims are most important. We must accept the underlying factual determinations of the district court unless they are clearly erroneous. Here, the district court's factual determinations are supported by the record and are not clearly erroneous. And given those factual determinations, based on our de novo review, we conclude that the statements were voluntary.

The district court correctly identified the relevant law, thoroughly considered the totality of the circumstances of Rooney's statement, and determined the statements were voluntary. Accordingly, we conclude the district court did not err when it determined that Rooney's statements during the hospital interview, following a *Miranda* warning, were voluntary and admissible.

**CONCLUSION**

For the foregoing reasons, we affirm the judgment of conviction.

Affirmed.

15

C O N C U R R E N C E

THISSEN, Justice (concurring).

I agree with the court's resolution of this case. I agree that the district court did not abuse its discretion when it granted respondent State of Minnesota's motion to preclude alternative-perpetrator evidence. I also agree that the district court did not err when it denied appellant Ryan Charles Rooney's motion to suppress statements he made during the hospital interview, following a *Miranda* warning.

I write separately to express my continuing concern with our alternative-perpetrator evidence jurisprudence—and particularly with the threshold test first articulated in dicta in *State v. Hawkins*, 260 N.W.2d 150, 159 (Minn. 1977). I set forth my concerns in detail in my concurrence in *State v. Woodard*, 942 N.W.2d 137, 145–48 (Minn. 2020) (Thissen, J., concurring). I will not repeat those concerns here.

Rooney did not challenge the use of the threshold test in the district court or on appeal; he only challenged the application of that test to the facts of this case. Therefore, the question of whether Minnesota courts should continue to use the *Hawkins* threshold test in alternative perpetrator cases is not before us.

In an appropriate case, where the issue is squarely presented to us, we should seriously consider replacing the threshold test with a traditional analysis under Minnesota Rules of Evidence 401 and 403 that courts routinely apply. Under the traditional analysis, courts should admit (subject to certain constitutional, statutory, and rules-based exceptions) evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the

evidence." Minn. R. Evid. 401 (defining "[r]elevant evidence"), 402 (providing that relevant evidence is generally admissible subject to certain exceptions). Such otherwise-admissible relevant evidence, however, may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Minn. R. Evid. 403.

PROCACCINI, Justice (concurring).

I join in the concurrence of Justice Thissen.