STATE of Minnesota, Respondent,

v.

Zachery Otis MATTHEWS, Appellant.

No. A09–184.

Supreme Court of Minnesota.

March 18, 2010.

Lori Swanson, Attorney General, St. Paul, MN; and Michael O. Freeman, Hennepin County Attorney, David C. Brown, Assistant Hennepin County Attorney, Minneapolis, MN, for respondent.

Lydia Villalva Lijó, Assistant Public Defender, St. Paul, MN, for appellant.

## OPINION

DIETZEN, Justice.

Appellant Zachery Otis Matthews was found guilty by a Hennepin County jury of first-degree premeditated murder, first-degree domestic-abuse murder, second-degree intentional murder, and interference with a dead body, arising out of the strangulation death of Kristine Larson on December 19, 2007. Matthews was sentenced to life without the possibility of release. On appeal, Matthews argues (1) that the district court erred in failing to properly instruct the jury regarding the past-pattern-of-domestic-abuse element of first-degree domestic-abuse murder; (2) that prosecutorial misconduct in the closing argument deprived him of a fair trial; and (3) various other pro se arguments. Because the jury instructions correctly stated the law, the alleged prosecutorial misconduct during closing argument did not affect Matthews' substantial rights, and Matthews' pro se arguments lack merit, we affirm.

Matthews and Larson began dating in 2004 and together had a son, D.L., in 2006. Larson ended her relationship with Matthews in May 2007. At the time of the murder, Larson and D.L. lived in St. Paul Park with Larson's mother, D.T., and Matthews lived in an apartment in St. Paul.

On the night of December 19, 2007, witnesses saw smoke coming from a car parked in a garage area in Minneapolis. After the fire was extinguished, a woman's body was discovered upside down in the back seat of the car. Police identified the victim as Kristine Larson. Larson's autopsy revealed ligature marks around her neck, blood around her nose, a cut on her forehead, and burn injuries on her face, back, and feet. The cause of death was ligature strangulation with a shoelace that had "a small loop on one end of the lace that was tied in a ring, and secured with a knot." The death was ruled a homicide. An arson investigator confirmed that the fire was intentionally started using yellow pages from a phone directory and concluded that the fire was an effort to cover up Larson's homicide.

Minneapolis police detectives interviewed several witnesses, and the investigation quickly turned to Matthews. During Matthews' first interview with police, he stated that Larson planned to arrive at his apartment around 2:00 p.m. to pick up D.L. and then go to Toys for Tots. According to Matthews, Larson did not show up, but he and D.L. took the bus to Toys for Tots, and returned home at about 6:00 p.m. Matthews stated that he had broken up with Larson a month earlier, but he admitted he was not happy that Larson was dating another man. He told police that he used his cell phone to call D.T. that afternoon to locate Larson.

Police reviewed bus video recordings and determined that Matthews and D.L. were not on the bus that afternoon. Further, a man matching Matthews' description was seen at about 7:30 that evening walking eastbound on the shoulder portion of Highway 94 crossing over the Mississippi Bridge toward St. Paul. Also, Matthews' cell-phone records revealed that his cell phone accessed a tower near his apartment in St. Paul in the late afternoon and then the cell phone accessed a Minneapolis tower between about 8:00 p.m. and 9:30 p.m.

At a second interview, Matthews was given a *Miranda* warning and confronted with the discrepancies between his story and the police investigation. Eventually, Matthews admitted that when he arrived at his apartment that evening he found Larson dead in his kitchen closet and he panicked. He stated that he carried Larson's body to her car, drove the car to Minneapolis, abandoned the car, and then walked alongside Highway 94 across the Mississippi bridge to his apartment in St. Paul. He denied killing Larson or starting the car on fire.

Police obtained a search warrant for Matthews' apartment. New yellow pages phone directories were in a package in the lobby of Matthews' apartment building; some of the directories were missing from the package. Blood found on a pillar near the kitchen and on the kitchen floor of Matthews' apartment was tested for DNA, and Matthews and Larson could not be excluded as contributors. A mixture of DNA was also found on the shoelace ligature. The predominant DNA was Larson's, but Matthews could not be excluded as a contributor.

Subsequently, Matthews was charged with second-degree intentional murder, in violation of Minn.Stat. § 609.19, subd. 1(1) (2008), and indicted for first-degree premeditated murder, in violation of Minn. Stat. § 609.185(a)(1) (2008), and first-degree domestic-abuse murder, in violation of Minn.Stat. § 609.185(a)(6) (2008). Before trial, the State moved to introduce various incidents of alleged domestic abuse to establish relationship evidence under Minn.Stat. § 634.20 (2008) and a past pattern of domestic abuse. The district court allowed the State to introduce 12 incidents between Matthews and Larson, concluding

that all 12 were admissible under Minn. Stat. § 634.20 and that 6 were also admissible as alleged past acts of domestic abuse.

At trial, the State introduced the autopsy and fire investigation results, Matthews' cell-phone records, and the substance of Matthews' interviews with the police. R.M. and M.B., two witnesses who were incarcerated with Matthews, also testified that Matthews made various admissions to them regarding Larson's murder. Both were awaiting sentencing on various charges and testified in exchange for reduced sentences. According to R.M., Matthews told him that he put a stringy object around Larson's neck, that she "passed out," and that he tried to "wake her up." When Matthews realized Larson was dead, he panicked and put her body in the car, drove to Minneapolis, parked the car in an alley and set it on fire, and then walked away. M.B. testified in a similar fashion.

The jury found Matthews guilty of first-degree premeditated murder, first-degree domestic-abuse murder, second-degree intentional murder, and interference with a dead body. Judgment of conviction was entered, and Matthews was sentenced to life without the possibility of release. This direct appeal followed.

## I.

Matthews argues that the district court erred in failing to properly instruct the jury regarding the past-pattern-of-domestic-abuse element of first-degree domestic-abuse murder, and therefore the unadjudicated jury verdict finding him guilty of first-degree domestic-abuse murder should be vacated. It is undisputed that the jury found Matthews guilty of first-degree premeditated murder and first-degree domes-

tic-abuse murder. Judgment of conviction was entered only for the offense of first-degree premeditated murder, and Matthews was sentenced to life without the possibility of release.[1]

Previously, the court has declined to address arguments related to an unadjudicated jury verdict on the ground of mootness. *State v. Jackson*, 773 N.W.2d 111, 125–26 (Minn.2009); *State v. Martinson*, 312 N.W.2d 249, 251 (Minn.1981). But we may exercise discretionary review "to decide issues that are technically moot when the issue is 'functionally justiciable' and one of public importance and statewide significance." *Jasper v. Comm'r of Pub. Safety*, 642 N.W.2d 435, 439 (Minn.2002) (quoting *State v. Brooks*, 604 N.W.2d 345, 347–48 (Minn.2000)). We exercise our discretion to address these issues. *See* Minn. R. Civ.App. P. 103.04.

### A. Failure to Instruct

■ Matthews argues that the district court failed to distinguish between past-pattern-of-domestic-abuse evidence and relationship evidence in the jury instructions, and therefore the jury could not distinguish between the different incidents of abuse. According to Matthews, it is likely that the jury improperly relied on relationship evidence to find a past pattern of domestic abuse.

■ Because Matthews did not object to the jury instructions at issue, we review for plain error. *See State v. Earl*, 702 N.W.2d 711, 720 (Minn.2005); *State v. Crowsbreast*, 629 N.W.2d 433, 437 (Minn. 2001). Under the plain-error test, an appellant must show that there was (1) an error, (2) that is plain, and (3) the error must affect substantial rights. *State v.*

---

1. A life sentence without the possibility of release is not available for a conviction of first-degree domestic-abuse murder without additional findings that did not occur here. *See* Minn.Stat. § 609.106, subd. 2(3) (2008).

*Griller,* 583 N.W.2d 736, 740 (Minn.1998). An error is plain if it is clear and obvious; usually this means an error that violates or contradicts case law, a rule, or an applicable standard of conduct. *State v. Ramey,* 721 N.W.2d 294, 302 (Minn.2006). The third prong is satisfied if the error was prejudicial and affected the outcome of the case. *Griller,* 583 N.W.2d at 741. If all three prongs of the test are met, we then determine whether we "should address the error to ensure fairness and the integrity of the judicial proceedings." *Id.* at 740.

 District courts possess significant discretion in the selection of jury-instruction language, and those jury "instructions must be read as a whole to determine whether they accurately describe the law." *Earl,* 702 N.W.2d at 720. "If the instructions, when read as a whole, correctly state[ ] the law in language that can be understood by the jury, there is no reversible error." *State v. Laine,* 715 N.W.2d 425, 432 (Minn.2006) (citation omitted) (internal quotation marks omitted).

For a conviction of first-degree domestic-abuse murder, the State must prove, among other things, that the defendant engaged in a past pattern of domestic abuse against the victim or another family or household member. Minn.Stat. § 609.185(a)(6). Domestic abuse is defined in this context as an act amounting to assault, criminal sexual conduct, or terroristic threats. Minn.Stat. § 609.185(c)(1) (2008). An act constitutes an assault if a defendant either "(1) commits an act with intent to cause fear in another of immediate bodily harm or death; or (2) intentionally inflicts or attempts to inflict bodily harm upon another." Minn.Stat. §§ 609.02, subd. 10, 609.224, subd. 1, and 609.2242, subd. 1 (2008).

Minnesota Statutes § 634.20 provides for the admission of evidence of "similar conduct" by the accused against the victim of domestic abuse, which is commonly referred to as relationship evidence. Relationship evidence is relevant because it "illuminate[s] the history of the relationship" between the victim and defendant and may also help prove motive or assist the jury in assessing witness credibility. *State v. McCoy,* 682 N.W.2d 153, 159, 161 (Minn.2004). "Similar conduct" under Minn.Stat. § 634.20 is broader than the enumerated offenses that constitute domestic abuse under Minn.Stat. § 609.185(c). While "similar conduct" includes assault, criminal sexual conduct, and terroristic threats, it also includes stalking and harassing phone calls, which is conduct that is not included in the definition of domestic abuse in Minn.Stat. § 609.185(c). *See* Minn.Stat. §§ 634.20 and 518B.01, subd. 2 (2008).

Before trial, the State sought to introduce 18 incidents between Matthews and Larson as both past-pattern-of-domestic-abuse evidence under Minn.Stat. § 609.185(a)(6) and relationship evidence under Minn.Stat. § 634.20.[2] The district court ruled that 12 incidents could be admitted as relationship evidence, including one that involved Matthews' repeated phone calls to Larson. It also ruled that 6 of these 12 incidents, all of which involved acts when Matthews hit, physically restrained, or threatened Larson with violence, were also admissible as alleged past acts of domestic abuse.

Before the testimony was given, the jury was instructed that:

> The purpose of this evidence, members of the jury, is to assist you in evaluating whether there is a past pattern of domestic abuse, which is one of the ele-

---

2. The State withdrew one incident at the mo-

tion hearing.

ments of one of the charges, Domestic Violence Murder. Some of the evidence is also being introduced to illuminate the history of the relationship between Mr. Matthews and the deceased, Kristine Larson.[3]

At the close of the case, the jury was instructed, among other things, that:

> Minnesota statutes define domestic abuse to include assault, which consists of either (1) committing an act with intent to cause fear in another of immediate bodily harm, or death, or (2) intentionally inflicting, or attempting to inflict bodily harm upon another.... Third ... the defendant engaged in a past pattern of domestic abuse against Kristine Larson. A past pattern consists of prior acts of domestic abuse, which form a reliable sample of observable traits or acts, which characterize an individual's behavior.

Matthews correctly points out that the instructions did not indicate that stalking and harassing phone calls do not qualify as past-pattern-of-domestic-abuse evidence under Minn.Stat. § 609.185(c). But the jury instructions given limited the definition of domestic abuse to assault, and did not include stalking and harassing phone calls. We presume that juries follow instructions given by the court. *State v. Taylor*, 650 N.W.2d 190, 207 (Minn.2002). Further, we have been cautious in assigning error for failing to give an instruction regarding the specific purpose for certain types of evidence. *Ture v. State*, 681 N.W.2d 9, 18 (Minn.2004) (noting that, in *State v. Broulik*, 606 N.W.2d 64, 69 (Minn. 2000), failure to instruct on specific purpose of Rule 404(b) evidence is not error unless request to so instruct was made). The jury instructions are consistent with

the definition of domestic abuse in Minn. Stat. § 609.185(c) and correctly state the law. Consequently, the jury instructions given did not constitute plain error.

### B. Improper Instruction

■ Matthews argues that the district court erred by failing to give the complete pattern jury instruction for the definition of a past pattern of domestic abuse. He concedes that he failed to raise this objection before the district court, and therefore our review is limited to a plainerror analysis. We review the instructions as a whole to determine if the instructions correctly state the law. *State v. Smith*, 674 N.W.2d 398, 401 (Minn.2004). The district court is not required to use pattern jury instructions. *Id.* at 400.

> The pattern jury instruction provides:

> A "past pattern" consists of prior acts of domestic abuse which form a reliable sample of observable traits or acts which characterize an individual's behavior. More than one prior act of domestic abuse is required for there to be a past pattern.

10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal*, CRIMJIG 11.15 (2006). The district court omitted the last sentence of that instruction.

We conclude that the jury instruction given did not constitute plain error. The instruction given indicated that a "past pattern" consists of "prior acts of domestic abuse." Both the term "past pattern" and the explanation that it consists of "prior *acts* " (emphasis added) make clear that more than one act of domestic abuse must be proven. As a result, the instruction correctly stated the law and did not con-

---

**3.** The wording varied slightly each time the instruction was given, but the substance remained unchanged.

fuse the jury. Further, the prosecutor told the jury in closing argument that "a past pattern has to include at least three prior instances of domestic abuse." *See State v. Vang*, 774 N.W.2d 566, 582 (Minn. 2009) (concluding that even if the district court instructions were incomplete, the State's closing argument correctly stated the law so that the defendant's substantial rights were not affected).

## II.

■ Matthews argues that the prosecutor engaged in misconduct during the closing argument that deprived him of a fair trial. Because no objection was made, we apply the modified plain-error test outlined in *Ramey*, 721 N.W.2d 294.[4] Under that test, the defendant has the burden to demonstrate that the misconduct constitutes (1) error, (2) that was plain. *State v. Wren*, 738 N.W.2d 378, 393 (Minn.2007); *Ramey*, 721 N.W.2d at 300. If the defendant is successful, the burden then shifts to the State to demonstrate that the error did not affect the defendant's substantial rights. *Ramey*, 721 N.W.2d at 300. To meet the third prong, the State must show that there is no "reasonable likelihood that the absence of the misconduct in question would have had a significant effect on the verdict of the jury." *Id.* at 302. If these three prongs are satisfied, the court then assesses whether the error should be addressed to ensure fairness and the integrity of the judicial proceedings. *Id.* at 298.

■ Matthews asserts three instances of prosecutorial misconduct. First, he argues that the prosecutor's statements that Matthews was in a "fit of insatiable rage," that he "hatched a plan" to "ambush" Larson, and that he landed a "powerful blow" to Larson's face, were not supported by the record. The prosecutor's argument need not be "colorless," and it may include conclusions and inferences that are reasonably drawn from the facts in evidence. *State v. Porter*, 526 N.W.2d 359, 363 (Minn.1995); *State v. Salitros*, 499 N.W.2d 815, 817 (Minn.1993); *State v. Wahlberg*, 296 N.W.2d 408, 419 (Minn.1980). Further, we have allowed "dramatic characterizations" of the murder when the evidence at trial supported those characterizations. *State v. MacLennan*, 702 N.W.2d 219, 236 (Minn.2005).

But D.T.'s testimony that Matthews was "a little upset, anxious," when she spoke to him on the day of the murder, and the manner in which Larson was killed, support the reasonable inference that Matthews was angry when he killed Larson. Further, evidence that the shoelace had a larger loop "threaded through the smaller loop," indicates that it was prepared in advance, supporting the reasonable inference that Matthews made a plan to attack Larson. Also, the nature of the injuries to

---

4. The State urges us to abandon the *Ramey* modified plain-error test on the ground that the defendant should bear the burden of proving that the misconduct affected substantial rights. The State argues that the *Ramey* modified test encourages defendants not to object at closing argument, and later assert prosecutorial misconduct to receive the benefit of the *Ramey* modified test. We do not overturn precedent unless there is a "compelling reason" to do so. *Oganov v. Am. Family Ins. Group*, 767 N.W.2d 21, 26 (Minn.2009). The State has provided no support for its claim regarding the effects of the *Ramey* modified plain-error test. In addition, application of the *Griller* plain-error test, rather than the *Ramey* modified plain-error test, would not affect the result in this case. *Cf. State v. Wren*, 738 N.W.2d 378, 394 n. 13 (Minn.2007) (concluding that the court did not need to decide whether the two-tiered standard announced in *State v. Caron*, 300 Minn. 123, 218 N.W.2d 197 (1974), for determining whether objected-to prosecutorial misconduct was harmless was still viable because the misconduct was harmless under both tiers). Therefore, we decline to reach this issue.

Larson's head and the DNA test results of the blood on the pillar support the prosecutor's statement that Larson was struck with a "powerful blow."

██ Matthews next challenges the prosecutor's statement that the fire originated "directly under the head and neck" of Larson. The arson investigator testified that the fire was intentionally set, and originated near the back seat on the passenger side. Because the evidence showed the fire was started in the vicinity of Larson's upside down body, it was a reasonable inference from this evidence that the fire was started under Larson's head.

██ Also, Matthews argues that the prosecutor's statement that D.L. witnessed the murder was not supported by the record. According to M.B. and R.M., Matthews admitted that he put D.L. in his bedroom before murdering Larson in the kitchen. If D.L. was in his bedroom, it is possible that he heard the struggle that resulted in Larson's murder. *See State v. Vance*, 765 N.W.2d 390, 394 (Minn.2009) (discussing that a child witnesses a murder by either seeing or hearing the murder). Assuming without deciding that the prosecutor's argument was not supported by the evidence, we conclude that the misconduct did not affect Matthews' substantial rights. The alleged misconduct is limited to a few lines in a 48–page closing argument, and therefore it did not permeate the entire argument. *See Wren*, 738 N.W.2d at 393 (Minn.2007) (misconduct that spanned 3 pages in a 70–page closing argument did not affect defendant's substantial rights); *State v. Griese*, 565 N.W.2d 419, 428 (Minn.1997) (misconduct that spanned 2 pages in a 50–page closing argument did not affect defendant's substantial rights). Additionally, the evidence of Matthews' guilt is overwhelming. *See MacLennan*, 702 N.W.2d at 236; *State v. Bradford*, 618 N.W.2d 782, 800 (Minn.2000); *Griese*, 565

N.W.2d at 428. And the jury was instructed that the statements of attorneys were not evidence. *State v. Johnson*, 616 N.W.2d 720, 728 (Minn.2000) (concluding that argument based on facts not in evidence did not prejudice the defendant, in part, because the jury was instructed that the arguments of counsel were not evidence).

██ Second, Matthews argues that the prosecutor degraded his defense by describing Matthews' explanation of events as "concocted," "ridiculous," and "unbelievable." The State argues that the prosecutor fashioned a colorful argument that pointed out why Matthews' version of events was "ridiculous" and "100 percent unbelievable." Prosecutors are allowed to argue that there is no merit to the specific defense raised by the defendant, although they may not belittle either the defendant or a particular defense in the abstract. *State v. Simion*, 745 N.W.2d 830, 844 (Minn.2008); *Salitros*, 499 N.W.2d at 818. Essentially, the prosecutor argued that Matthews' story—someone had dumped Larson's dead body at his apartment, Matthews transported her body to Minneapolis, and another person set the car on fire—is unbelievable. While the argument is dramatic, it is directed at the credibility of Matthews' description of events, and not the validity of a particular defense in the abstract.

██ Third, Matthews argues that the prosecutor materially misstated the law by including an incident admitted as relationship evidence to establish a past pattern of domestic abuse. Matthews is correct that the prosecutor referenced one incident of relationship evidence along with three incidents of domestic abuse to argue that the State had proven a past pattern of domestic abuse. We have carefully reviewed the record and conclude that the prosecutor

did not materially misstate the law regarding the past-pattern-of-domestic-abuse element. *See State v. Walsh,* 495 N.W.2d 602, 607 (Minn.1993) (concluding that we review "the closing argument as a whole, rather than just selective phrases or remarks that may be taken out of context or given undue prominence"). Moreover, the jury was properly instructed on the past-pattern-of-domestic-abuse element, including that domestic abuse was defined to involve an assault. And there were numerous acts of domestic abuse by Matthews against Larson, in addition to the three the prosecutor referenced. The prosecutor did not commit plain error that affected Matthews' substantial rights.

### III.

In his pro se supplemental brief, Matthews raises three arguments. First, he argues that the district court erred in admitting evidence of domestic abuse because the incidents were not corroborated and did not fall within the conduct defined by Minn.Stat. § 634.20. We review a district court evidentiary ruling for an abuse of discretion. *State v. Goelz,* 743 N.W.2d 249, 254 (Minn.2007).

Relationship evidence is admissible under Minn.Stat. § 634.20 "without requiring the heightened standard that the evidence be clear and convincing." *McCoy,* 682 N.W.2d at 159. The crime of domestic abuse is "unique in that it typically occurs in the privacy of the home, it frequently involves a pattern of activity that may escalate over time, and it is often underreported." *Id.* at 161. Therefore, the "interests of justice are best served" by admitting relationship evidence when it provides context for the crime charged. *Id.* at 159, 161.

We conclude that the district court did not abuse its discretion in admitting relationship evidence under Minn.Stat.

§ 634.20. All 12 incidents admitted as relationship evidence fall within the conduct defined by Minn.Stat. § 634.20, and the probative value of those incidents was not substantially outweighed by the danger of unfair prejudice.

Second, Matthews argues that the indictment was insufficient because it failed to charge domestic abuse, an essential element of first-degree domestic-abuse murder. The State counters that Matthews' argument is untimely and without merit. The sufficiency of an indictment is a constitutional question we review de novo. *State v. Kendell,* 723 N.W.2d 597, 611 (Minn.2006).

Objections to an indictment must be made by motion no later than three days before the omnibus hearing. Minn. R.Crim. P. 10.04, subd. 1, and 17.06, subds. 2–3; *see also State v. Whittaker,* 568 N.W.2d 440, 448 (Minn.1997). Failure to include "all defenses, objections, issues, and requests" in a motion constitutes a waiver. Minn. R.Crim. P. 10.03; *see also Whittaker,* 568 N.W.2d at 448. The court may grant relief from the waiver for good cause. *Id.* at 448.

Matthews timely moved to dismiss the first-degree domestic-abuse murder count based on the objection that the State had insufficient evidence to prove a past pattern of domestic abuse. But Matthews did not include the objection that the indictment was insufficient. Therefore, Matthews has waived his right to argue that the indictment failed to charge domestic abuse. *See State v. Drieman,* 457 N.W.2d 703, 709 (Minn.1990) (declining to consider defendant's new objection to the indictment because it was not included in his original motion objecting to the indictment). Further, "[a] presumption of regularity attaches to a grand jury indictment, and courts will rarely invalidate the indict-

ment." *Whittaker,* 568 N.W.2d at 448. This is "especially true" where the defendant has been found guilty at a fair trial. *State v. Scruggs,* 421 N.W.2d 707, 717 (Minn.1988). Therefore, we conclude that Matthews has not shown good cause to review his indictment.

Third, Matthews argues that his *Batson* challenge for juror 31 was improperly denied. The State responds that the district court properly denied Matthews' *Batson* challenge. The Fourteenth Amendment "prohibits purposeful racial discrimination in jury selection." *State v. Martin,* 773 N.W.2d 89, 100–01 (Minn. 2009). *Accord Batson v. Kentucky,* 476 U.S. 79, 84, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). We utilize the *Batson* three-step framework for determining whether a peremptory challenge is motivated by racial discrimination. *Martin,* 773 N.W.2d at 100–01. *Batson* challenges are not reversed unless the district court's denial was clearly erroneous. *Id.* at 101. We "afford great deference [to the district court] because 'the record may not reflect all of the relevant circumstances that the court may consider.' " *Id.* (quoting *State v. Pendleton,* 725 N.W.2d 717, 724 (Minn. 2007)). *See also State v. Bailey,* 732 N.W.2d 612, 619 (Minn.2007) (concluding that in review of *Batson* challenge, considerable deference is given to the district court's finding regarding the State's intent because that finding is based on credibility).

The first step of a *Batson* challenge is for the defendant to make a prima facie showing that the State's peremptory challenge was racially motivated. *Martin,* 773 N.W.2d at 101. If the defendant does so, the State must then provide a race-neutral explanation, which "need not be persuasive or even plausible," for the peremptory challenge. *Id.* The third step of a *Batson* challenge is for the district court to

determine whether the defendant has proven purposeful racial discrimination. *Id.*

Matthews is African American. It was unclear whether juror 31 was African American; he marked "other" on his jury questionnaire. For purposes of the *Batson* analysis, the district court considered juror 31 African American. When the district court engaged in its analysis, it first noted that out of nine jurors selected at that point, only one was a person of color. The court also discussed that out of the five peremptory challenges the State had exercised at that point, four were against people of color. As a result, the district court found that the defendant satisfied the first step of his *Batson* challenge.

Second, the district court considered whether the State had provided a race-neutral reason for excluding juror 31. The State explained that juror 31 "made a number of statements which ... in effect, blam[ed] the victim of domestic abuse." The State indicated that it did not want a juror who believed that domestic abuse victims were "sort of at fault." The district court determined that juror 31's view on domestic assault was a race-neutral reason for excluding juror 31.

Finally, the district court considered the State's other peremptory challenges to jurors of color but found that the record did not indicate that any of them had been challenged because of their race. For example, juror 6 was a woman from Somalia who had difficulty with English, particularly "the concepts of reasonable doubt [and] burden of proof." Juror 11 was an African–American woman who was married to a man incarcerated for murder and had a brother who worked for the Public Defender's Office. Juror 30 was an Asian woman whose father was arrested for domestic abuse. Therefore, the district court concluded that Matthews had not shown

the State engaged in purposeful discrimination when it struck juror 31. Based on its analysis, the district court overruled Matthews' *Batson* challenge.

Matthews argues that the district court improperly concluded that he had not proven the State challenged juror 31 because of his race. He contends that there is evidence of purposeful discrimination because the State did not challenge other jurors who had experienced murder or domestic abuse in their families.

It is true that other jurors had personal experience with domestic abuse. None of those jurors, however, expressed that the victim was partially at fault.[5] *See State v. Gomez,* 721 N.W.2d 871, 884–85 (Minn. 2006) (explaining that although other jurors had family or friends who were convicted of a crime, none of those jurors expressed that it was a wrongful conviction, thereby validating the State's race-neutral explanation).

Additionally, the district court's conclusion that there was no evidence demonstrating that the State engaged in a pattern of challenging jurors of color because of their race is supported by the record. The State's reasons for excluding other jurors of color—because of family involvement in the legal system or language problems—were all credible, race-neutral reasons for challenging those jurors. *See Martin,* 773 N.W.2d at 104 ("We have consistently held that a family member's involvement with the legal system is a legitimate race-neutral reason ... to exercise a peremptory challenge."); *Wren,* 738 N.W.2d at 388–89 (recognizing that language difficulties are a race-neutral reason for exercising a peremptory challenge). As a result, the district court's conclusion that Matthews failed to establish purpose-

ful discrimination in the State's challenge to juror 31 is not clearly erroneous.

Affirmed.

---

5. Juror 13's coworker was killed by her husband. Juror 17's brother was murdered, and her niece was a victim of domestic abuse.