STATE OF MINNESOTA

IN SUPREME COURT

A22-1679

Hennepin County

State of Minnesota,

        Respondent,

vs.

Jerry Arnold Westrom,

        Appellant.

Hudson, C.J.

Filed:  May 8, 2024
Office of Appellate Courts

_____

Keith Ellison, Attorney General, Saint Paul, Minnesota; and

Mary F. Moriarty, Hennepin County Attorney, Adam E. Petras, Assistant County Attorney, Minneapolis, Minnesota, for respondent.

Eric J. Nelson, Halberg Criminal Defense, Bloomington, Minnesota, for appellant.

_____

S Y L L A B U S

1.     The district court did not err in concluding that the genetic analysis of a napkin discarded by appellant was not a search because the analysis was only capable of matching appellant's DNA to the DNA found at the crime scene and appellant had no reasonable expectation of privacy in his identifying information.

1

2.      Any error in precluding appellant from presenting alternative-perpetrator evidence at trial was harmless beyond a reasonable doubt.

3.      The district court did not abuse its discretion when it excluded testimony from appellant's expert as late discovery because the district court properly exercised its authority to respond to violations of the Minnesota Rules of Criminal Procedure.

4.      The State did not commit prosecutorial misconduct during its closing argument because none of the prosecutor's statements constituted error.

5.      The circumstantial evidence presented at trial was sufficient to support the jury's verdict that appellant was guilty of first-degree premeditated murder, and appellant advances no reasonable hypothesis inconsistent with appellant's guilt.

6.      Appellant did not receive ineffective assistance of counsel in violation of his constitutional rights because appellant has not demonstrated that trial counsel's personal interests materially limited the representation, and appellant was not prejudiced by the representation.

7.      No cumulative errors denied appellant his right to a fair trial where only one potential error was present, and the error was harmless beyond a reasonable doubt.

8.      It was error to convict appellant of both first-degree felony murder and the lesser-included offense of second-degree intentional murder.

Affirmed in part, reversed in part, and remanded.

HUDSON, Chief Justice.

A jury found appellant Jerry Arnold Westrom guilty of first-degree premeditated murder under Minn. Stat. § 609.185(a)(1) (2022) and second-degree intentional murder under Minn. Stat. § 609.19, subd. 1(1) (2022). The district court entered judgments for conviction on both counts and imposed a sentence of life with the possibility of parole after 30 years. On direct appeal to our court, Westrom challenges the district court's evidentiary rulings regarding DNA evidence, alternative-perpetrator evidence, and expert testimony. He also argues that the State committed prejudicial prosecutorial misconduct, that there was insufficient evidence to support his convictions, that he received ineffective assistance of counsel, and that cumulative errors denied him his right to a fair trial. Because the district court did not commit any error requiring reversal, Westrom's constitutional rights were not violated during his trial, and the State presented sufficient evidence, we affirm Westrom's conviction of first-degree premeditated murder. But because the district court violated Minn. Stat. § 609.04 (2022) when it entered a conviction on the lesser-included second-degree murder offense in addition to the conviction for first-degree premeditated murder, we reverse the second-degree murder conviction and remand to the district court to vacate that conviction.

**FACTS**

On June 13, 1993, Jeanie Childs was found stabbed to death in her South Minneapolis apartment. Her body was lying face-up on the floor of her bedroom, naked except for a pair of socks. The bed was soaked with blood, and blood covered the walls of

the bedroom and the adjoining bathroom. While investigating the crime scene, police noted several bloody footprints on the floor of the bedroom, a bloodstained towel hanging on the bathroom wall, and a bloodstained washcloth on the toilet seat. The Bureau of Criminal Apprehension ("BCA") took lifts of the footprints and catalogued several of the items in the apartment for forensic analysis. Childs' autopsy revealed that she had been stabbed about 65 times. She had a stab wound to her heart, and several of the wounds appeared to have been made after she had died. A large, deep slash ran across her abdomen. Hairs were found on her hands, which had suffered multiple defensive wounds.

Police initially investigated Childs' boyfriend, Arthur Gray, who held the lease of the apartment where Childs was killed. Gray was unemployed but had been described as Childs' trafficker or pimp.[1] He had allegedly physically abused Childs previously in the apartment where she was killed. Gray was identified as the source of the hairs on Childs' hands, and his DNA was found on the comforter of the bed. Gray had an alibi, though, as he was purportedly with a friend at a motorcycle rally in Wisconsin at the time of the murder. Ultimately, the case went cold.

In 2018, the police began working with the FBI to review Childs' murder. They sent a DNA sample from the crime scene to DNA Solutions, Inc. to create a single nucleotide polymorphism ("SNP") profile[2] that could be compared with profiles on

---

[1] The parties do not appear to dispute that Childs earned money through prostitution or that her clients frequently visited the apartment.

[2] A single nucleotide polymorphism ("SNP," pronounced "snip") profile extracts highly informative segments from a DNA sample and can be used to predict the source's physical appearance, identify distant genetic relationships, and indicate susceptibility to

commercial genealogical databases to identify the source's relatives. After receiving the SNP profile, police arranged for it to be uploaded to several commercial genealogical websites, including GEDmatch, Ancestry.com, and MyHeritage. A potential match was located on MyHeritage that appeared to be a first cousin to the source of the crime scene DNA. Law enforcement then used the match to construct a family tree that identified Westrom as the likely source.

After learning that Westrom would be attending a hockey game in Mequon, Wisconsin, police followed him to the game and watched him order food from a concession stand. Westrom wiped his mouth with a napkin and threw it away in a trash can. Investigators took the napkin out of the trash can and sent it to the BCA for analysis. The BCA generated a short tandem repeat ("STR") DNA profile from the residue on the napkin and found that it matched the crime scene sample. Police then obtained a search warrant to collect a known sample of Westrom's DNA (to validate the match) and took Westrom into custody. He was subsequently charged with second-degree intentional murder in violation of Minn. Stat. § 609.19, subd. 1(1). A grand jury later indicted Westrom for first-degree premeditated murder in violation of Minn. Stat. § 609.185(a)(1).

Westrom moved to suppress all evidence stemming from the police's comparison of the SNP profile created from DNA gathered from the crime scene with other profiles on

---

disease. Erin Murphy, *Law and Policy Oversight of Familial Searches in Recreational Genealogy Databases*, 292 Forensic Sci. Int'l. e5, e5–e6 (2018). By contrast, law enforcement has traditionally utilized short tandem repeat ("STR") profiles in forensic investigations. *Id.* STR profiles focus exclusively on noncoding segments of DNA that do not yield information about the source but can be used to easily distinguish individuals from each other. *Id.*

commercial genealogical databases. His motion also contested the admissibility of evidence obtained through the STR analysis of DNA taken from his discarded napkin. The district court denied Westrom's motion and concluded that no search had occurred because Westrom held no expectation of privacy in the information contained within his DNA when police only used his DNA for the purpose of identification.

The State arranged for Mark Ulrick, a forensics administrator for the City of Minneapolis, to testify about the friction ridge footprint analysis he had performed that identified Westrom as the source of three bloody footprints left at the crime scene. Westrom hired Dr. Michael Nirenberg to dispute these results using the Reel Method of forensic podiatry, which analyzes a subject's morphological features by measuring multiple dimensions of a footprint. The State challenged Dr. Nirenberg's methodology, and a *Frye-Mack*[3] hearing was held. During the hearing, the State confronted Dr. Nirenberg with evidence that the footprint samples he relied on from Westrom were collected using a different procedure from what Dr. Nirenberg assumed in his analysis. In response, Dr. Nirenberg stated, "it weakens my findings significantly."

About 4 months after the hearing, and shortly before trial was scheduled to begin, Westrom disclosed a new report from Dr. Nirenberg that utilized two additional methods of forensic podiatry: the Visual Overlay Method (which examines a footprint's traced outline) and the Gunn Method (which measures the distance between various points on a

---

[3] Minnesota uses the *Frye-Mack* standard for judging the admissibility of expert testimony that involves "a novel scientific theory" or "emerging scientific techniques." *State v. Garland*, 942 N.W.2d 732, 746 (Minn. 2020) (citations omitted) (internal quotation marks omitted).

footprint).  The district court ordered that Westrom be precluded from offering evidence related to any of the forensic podiatry methods, because the Reel Method did not meet the *Frye-Mack* standard and the other methods were disclosed too late.  It also found that forensic podiatry in general was unreliable for purposes of identification and that the Gunn and Visual Overlay Methods would not have met the *Frye-Mack* standard even if they had been presented sooner.

Around that same time, Westrom's counsel approached the State about a possible conflict of interest:  he had represented the district court judge's niece in a personal injury case.  At the State's request, a hearing was held, and it was determined that the representation was "successfully completed in 2017."  This information allayed the State's concerns about any potential bias in favor of Westrom's counsel.  During a subsequent hearing to set a new trial date, the judge criticized Westrom's counsel for not investigating alternative-perpetrator evidence sooner, and counsel accused the judge of "personalizing it."

Westrom moved next to introduce alternative-perpetrator evidence.  He named Arthur Gray, as well as three other people who had been subjects in the original investigation.  In a reply memorandum, Westrom named an additional individual who had also been investigated.  The district court determined that Westrom had proffered sufficient foundational evidence to connect Gray to the crime but not the other four people.

At trial, the State presented the DNA evidence linking Westrom to the crime scene and called Ulrick and Dr. Alicia Wilcox, an expert witness on latent print analysis, to testify about their findings that connected Westrom to the bloody footprints.  Dr. Nirenberg's

reports and testimony were precluded, and Westrom called no forensic or medical experts at trial. The jury found Westrom guilty of both charged counts. The district court sentenced Westrom to life in prison with the possibility of parole after 30 years. Westrom appealed to our court.

## ANALYSIS

Westrom advances seven challenges to his convictions for first-degree premeditated murder and second-degree intentional murder. We address each argument in turn before considering an additional issue that was not raised by the parties.

### I.

Westrom first claims that his constitutional rights were violated when police generated and analyzed an STR profile containing DNA gathered from his discarded napkin. We review the district court's legal conclusions on the constitutionality of searches and seizures de novo. *State v. Anderson*, 733 N.W.2d 128, 136 (Minn. 2007). Both the United States and Minnesota Constitutions guarantee people the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" by the government. U.S. Const. amend. IV; Minn. Const. art. I, § 10.[4] A search occurs when the government intrudes upon a "reasonable expectation of privacy" to gain information. *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring). This expectation of privacy must also be maintained subjectively, *State v. Gail*, 713 N.W.2d 851, 860 (Minn.

---

[4]     Although our state constitution "provide[s] greater protection against suspicionless law enforcement conduct than the Fourth Amendment," *State v. Leonard*, 943 N.W.2d 149, 156 (Minn. 2020), Westrom does not argue that we should interpret our state constitution more broadly than the federal constitution here.

8

2006), and it is usually lost if an object is abandoned. *City of St. Paul v. Vaughn*, 237 N.W.2d 365, 370–71 (Minn. 1975).

Even if the seizure of an object does not violate an expectation of privacy, the subsequent testing of the object to reveal further information may yet implicate additional privacy interests. *See Skinner v. Ry. Lab. Execs.' Ass'n*, 489 U.S. 602, 616 (1989) (finding a further invasion of privacy in the "ensuing chemical analysis" of a lawfully obtained biological sample). But the United States Supreme Court has held that when the analysis of an STR sample lawfully obtained from an arrestee can only reveal the identity of the source—and not more personal information such as "predisposition for a particular disease or other hereditary factors not relevant to identity"—a search has not occurred. *Maryland v. King*, 569 U.S. 435, 464–65 (2013). In *King*, the Court wrote, "[i]n this respect the use of DNA for identification is no different than matching an arrestee's face to a wanted poster of a previously unidentified suspect; or matching tattoos to known gang symbols to reveal a criminal affiliation; or matching the arrestee's fingerprints to those recovered from a crime scene." *Id.* at 451.

Here, Westrom asserts no property interest in the discarded napkin as an "effect," but maintains that he nevertheless held an expectation of privacy in the genetic information police extracted from the DNA and used to link him with evidence from the crime scene. Noting the "deeply personal and private nature of DNA profiles," Westrom claims that the seizure of his napkin gave police "access to *all* of [his] genetic information." But the facts before us reflect otherwise. The STR profile generated from Westrom's discarded napkin was analyzed using the same method as the STR profile in *King*. Both analyses gave police

9

access to only the noncoding parts of the subjects' DNA; thus, the analyses were incapable of "revealing information beyond identification." *King*, 569 U.S. at 464 (citation omitted) (internal quotation marks omitted). Because the police had lawfully acquired possession of the napkin and did not extract from it information beyond the equivalent of a genetic "fingerprint," their analysis of the napkin was not a search.

We note that Westrom has not challenged on appeal the creation of a SNP profile from his DNA left at the 1993 crime scene or the genealogical analysis that was conducted using this profile. Although the earlier SNP profile could reveal personal information beyond merely identity, we focus only on the claims before us and express no opinion on the potential privacy concerns the analysis of such profiles may generate.[5] Accordingly,

_____

[5] Westrom submitted a citation of supplemental authority directing us to a new Minnesota law, the "Genetic Information Privacy Act," which prohibits direct-to-consumer genetic testing companies from collecting, testing, or disclosing any Minnesotan's genetic data without first obtaining the consumer's express consent. *See* Minn. Stat. § 325F.995, subd. 2(a)(2), *as amended by*, Act of May 23, 2023, ch. 57, art. 4, § 18. The law also provides that companies must not disclose genetic data to law enforcement "unless the disclosure is made pursuant to a valid search warrant or court order." *Id.*, subd. 2(a)(3). Because Westrom does not challenge the handling of his genetic data recovered from the crime scene and sent to genetic testing companies for analysis, this law is not implicated in his appeal. We note, however, that law enforcement should pay heed to these protections, which evidence the privacy interests of Minnesotans as expressed by the Legislature, in future investigations.

Westrom also claims that the police violated Minnesota law during their investigation and that these violations warrant suppression of his DNA evidence. Specifically, he alleges that the police used a "false pretense" to identify Westrom by using a fake MyHeritage account in violation of Minn. Stat. § 609.527 (2022), disseminated confidential investigative data to third parties by uploading the crime scene profile to MyHeritage in violation of Minn. Stat. § 13.09(a) (2022), and violated Minn. Stat. § 609.43 (2022) when they committed the previous two offenses as public employees. Westrom did not raise these claims before the district court, so we will not consider them here. *See State v. Myhre*, 875 N.W.2d 799, 807 (Minn. 2016) ("When . . . a defendant fails to preserve

we find that the district court did not err in concluding that the genetic analysis of a napkin discarded by Westrom—capable only of matching his DNA to the DNA found at the crime scene—was not a search under the United States or Minnesota Constitutions.

## II.

Westrom next claims that he was denied the right to a fair trial when the district court precluded him from introducing evidence of four alleged alternative perpetrators. We review the exclusion of alternative-perpetrator evidence by the district court for an abuse of discretion. *State v. Woodard*, 942 N.W.2d 137, 141 (Minn. 2020). Yet even if the district court erred, we must further find that the error was not harmless beyond a reasonable doubt to reverse the district court's decision. *State v. Ferguson*, 804 N.W.2d 586, 590 (Minn. 2011). The exclusion of evidence is harmless beyond a reasonable doubt when, "assuming the potential damage of the excluded evidence were fully realized, a reasonable jury 'would have reached the same verdict.' " *Troxel v. State*, 875 N.W.2d 302, 308 (Minn. 2016) (quoting *State v. Post*, 512 N.W.2d 99, 102 (Minn. 1994)).

Criminal defendants have a constitutional right to present a complete defense by introducing evidence that shows an alternative perpetrator committed the crime, *id.* at 590–91, but "[t]his right is not absolute." *State v. Jenkins*, 782 N.W.2d 211, 224 (Minn. 2010). We require defendants to satisfy the two-step test outlined in *State v. Hawkins* before admitting alternative-perpetrator evidence. 260 N.W.2d 150, 159 (Minn. 1977). First, a defendant must make a foundational proffer that has "an inherent tendency to

issues for review at every level of the judicial process and provides no excuse for his failure, those issues are forfeited and we will not consider them.").

connect [a third party] with the actual commission of the crime." *Id.* (citation omitted) (internal quotation marks omitted). Second, "evidence of a motive of the third person to commit the crime, threats by the third person, or other miscellaneous facts which would tend to prove the third person committed the act" may be introduced if the ordinary rules of evidence are satisfied. *Id.*

Although the district court admitted evidence concerning one of Westrom's alleged alternative perpetrators—Arthur Gray—it denied Westrom's proffers concerning four other people: G.V., J.E., J.C., and T.K. Westrom contends that his proffers as to each of these four other individuals satisfied the *Hawkins* test and that the district court abused its discretion in finding otherwise.

Westrom's proffer as to G.V. included evidence that G.V. was Childs' client, that G.V. had an appointment with her the day of her death, and that G.V. was described by a witness as a "fatal attraction." Westrom's proffer as to J.E. included evidence that J.E.'s appearance was like a man seen leaving Childs' apartment building the day of the murder and his blood was found in the building's stairwell. Westrom's proffer as to J.C. included evidence that J.C.: (1) was convicted of murdering a woman in 1994, where the victim was found lying naked with multiple knife wounds in her blood-spattered apartment with no signs of forced entry; (2) could not be excluded as a contributor of the DNA found on Childs' comforter; and (3) admitted to having been in Childs' apartment building before. Finally, Westrom's proffer as to T.K. included evidence that T.K. lived two doors down from Childs, was "in and out" of his apartment the day of the murder, waved a knife

12

threateningly at residents the next day while referring to Childs as "the prostitute," and had multiple convictions for criminal sexual conduct.

We need not decide here whether any of Westrom's proffers were sufficient under the *Hawkins* test. Even if the jury had been presented with the evidence contained in *all* of these proffers (and if the "potential damage" of the evidence had been fully realized), we are convinced that a reasonable jury would have returned the same verdict. *Troxel*, 875 N.W.2d at 308. There was strong forensic evidence inculpating Westrom. *See State v. Vance*, 714 N.W.2d 428, 439 (reasoning that the exclusion of alternative-perpetrator evidence was harmless beyond a reasonable doubt because "the evidence incriminating [the defendant] was strong."). Although there was evidence (of varying strength) that may arguably have tended to connect one or more of these alleged alternative perpetrators to the commission of the crime, there was no evidence that any of these alleged alternative perpetrators stood barefoot in Childs' blood when she died, as was the case for Westrom.[6] We therefore conclude that the exclusion of the evidence contained in all of Westrom's proffers "did not affect the outcome of the trial" and that any error in excluding it was harmless beyond a reasonable doubt. *Id.*

## III.

Westrom asserts that Dr. Nirenberg's second report was wrongly excluded as late discovery and that he was entitled to a *Frye-Mack* hearing to assess the reliability of the two additional methods of forensic podiatry introduced by the second report. District

---

[6] J.C.'s footprints were compared with one of the prints left at the crime scene, and the result was inconclusive.

courts enjoy considerable discretion in enforcing the rules of discovery. *State v. Lindsey*, 284 N.W.2d 368, 373 (Minn. 1979).

If a party "fails to comply with a discovery rule or order, the court may, on notice and motion, order the party to permit the discovery, grant a continuance, or enter any order it deems just in the circumstances." Minn. R. Crim. P. 9.03, subd. 8. When ordering the preclusion of evidence as a sanction for violating discovery rules, we have held that judges should consider: "(1) the reason why disclosure was not made; (2) the extent of prejudice to the opposing party; (3) the feasibility of rectifying that prejudice by a continuance; and (4) any other relevant factors." *Lindsey*, 284 N.W.2d at 373.

Here, Westrom's late disclosure of Dr. Nirenberg's second report shortly before the scheduled trial violated Minn. R. Crim. P. 9.02, subd 1., which required him to disclose all expert reports before the Rule 11 Omnibus Hearing. Thus, upon the State's motion to preclude this report as late discovery, the district court was entitled to enter any order it deemed just in the circumstances, including the preclusion of the report. The *Lindsey* factors support this decision. First, the district court found that "nothing in the record indicat[ed] that defense counsel or Dr. Nirenberg were prevented from inquiring" earlier into the faulty procedure employed in gathering the data for the first report. Second, the late disclosure significantly prejudiced the State's ability to prepare for trial, which was at that time set to begin just 1 month later.[7] Third, a continuance would not have been

---

[7]    Westrom's argument that the trial was continued 2 days after the ruling excluding Dr. Nirenberg's testimony (thus alleviating concerns of delay) misunderstands our standard of review. Logically, we must examine whether the district court abused its discretion by considering the circumstances as they existed *at the time the district court's*

14

feasible, given the time necessary for a *Frye-Mack* hearing and the 2½ years the case had already been pending. Considering the wide berth given the district court in managing discovery matters, we conclude the district court did not abuse its discretion in precluding the testimony of Dr. Nirenberg regarding his second report.[8]

IV.

Westrom claims that the State committed prosecutorial misconduct during its closing argument and that this misconduct warrants a new trial. When a defendant fails to object to alleged prosecutorial misconduct at trial—as Westrom did—we apply the modified plain-error test of *State v. Ramey*, 721 N.W.2d 294, 299–300 (Minn. 2006), under which "the defendant has the burden to demonstrate that the misconduct constitutes (1) error, (2) that was plain." *State v. Matthews*, 779 N.W.2d 543, 551 (Minn. 2010). "If the defendant is successful, the burden then shifts to the State to demonstrate that the error did not affect the defendant's substantial rights." *Id.* If the defendant satisfies the first two

---

*decision was made. Cf. State v. Harris*, 589 N.W.2d 782, 790 (Minn. 1999) (disregarding facts relevant to a district court's probable cause determination because those facts were "unknown . . . at the time the warrant was issued"). Given the sequence of events here, the district court's concern about discovery-induced delay was valid.

[8] The district court further determined that the entire field of forensic podiatry—which differs from the print-based friction ridge analysis employed by the state—did not meet the *Frye-Mack* standard for admissibility. After conducting a *Frye-Mack* hearing at which Dr. Nirenberg testified about the Reel Method and about forensic podiatry in general, the district court concluded that "there is much more work to be done before foot morphology for identification purposes, using things such as size and shape measurements, can be generally considered scientifically accepted and reliable." Because the Gunn and Visual Overlay Methods are similarly rooted in the field of forensic podiatry, the district court reasoned that they would not have met the *Frye-Mack* standard, even if they were timely disclosed. We agree.

15

prongs and the State fails to satisfy the third prong, we determine "whether the error should be addressed to ensure fairness and the integrity of the judicial proceedings." *Id.*; *see also State v. Parker*, 901 N.W.2d 917, 926 (Minn. 2017).

In making a closing argument, the State may "vigorously argue its case" by pointing out the lack of merit in a particular defense, but it "may not belittle the defense, either in the abstract or by suggesting that the defendant raised the defense because it was the only defense that may be successful." *State v. MacLennan*, 702 N.W.2d 219, 236 (Minn. 2005). Additionally, the State may present "all legitimate arguments on the evidence and all proper inferences that can be drawn from that evidence." *State v. Pearson*, 775 N.W.2d 155, 163 (Minn. 2009). But it may not "speculate without a factual basis." *Id.*; *see also State v. Peltier*, 874 N.W.2d 792, 804 (Minn. 2016). Neither may the State improperly call attention to the fact that the defendant did not testify at trial. *State v. Naylor*, 474 N.W.2d 314, 321 (Minn. 1991).

Here, Westrom takes issue with three statements made by the prosecutor during closing argument. First, he argues that the prosecutor belittled his defense and argued facts not in evidence when he referred to the defense theory as "fantasy" and equated the probability of its truth to that of winning the lottery. Second, he claims that the prosecutor's mention of "wet semen" improperly speculated that Westrom's semen was deposited in Childs' apartment at the time of the murder. And third, Westrom contends that the prosecutor's response of "no, no, no, no, no" to the notion that Westrom could argue he had left DNA evidence at the apartment on a prior occasion—when he previously told police that he had never been there—improperly called attention to Westrom's decision

16

not to testify at trial. He also claims that this statement suggested that Westrom's conduct after Childs' death sufficiently proved his guilt, contrary to this court's holding in *State v. McTague*, 252 N.W. 446, 448 (Minn. 1934).

None of Westrom's prosecutorial misconduct arguments succeed. We have previously held that a prosecutor's use of the word "fantasy" in reference to the defense's theory was, when put in the proper context, a comment on the "merits or the supporting evidence of possible defenses," and not a belittlement of the defense. *State v. Davis*, 982 N.W.2d 716, 727 (Minn. 2022). Here, the context shows that the prosecutor was pointing out the difficulty in squaring the theory that Westrom had never visited the apartment with the evidence in this case—the idea that someone other than Westrom "magically transported" his bloody footprints and DNA to the crime scene was a "fantasy." Because this comment was a critique of the merits of Westrom's transfer theory, and not an abstract belittlement of Westrom's defense, it was not misconduct. Similarly, the prosecutor's statement that the chances of the physical crime scene evidence appearing the way it did without Westrom having ever visited the apartment are as low as winning the lottery was not "speculation" but rather a "proper inference" drawn from the extreme unlikelihood of the transfer theory.

Next, the prosecutor's mention of "wet semen" did not imply that the semen was deposited at the time of the murder, but rather, for the transfer theory to be true, "somebody or something would have had to have Mr. Westrom's wet semen on them or on the object . . . and then deposited the semen on the comforter, all while leaving no trace of themselves." When looking at the context in which the prosecutor discussed this subject,

17

then, it is apparent that that the prosecutor was only claiming that Westrom's semen must have been "wet" whenever it was deposited, not that it was deposited contemporaneously with the murder.

Finally, the statement that Westrom's testimony to police was inconsistent with any explanation other than the transfer defense was not a comment on his failure to testify. In context, the statement suggests that, if the defense argues that Westrom left DNA at Childs' apartment on a prior occasion, it would be "[i]nconsistent with his statement" that he had never visited the apartment before. This statement is a comment on the testimony Westrom *did* give, not his failure to testify. This comment does not implicate *McTague* in any way. That case dealt with reference to evidence of flight, escape, or passing under an assumed name—circumstances not present here. *See McTague*, 252 N.W. at 448. Because none of the prosecutor's statements constituted error, we need not proceed further in the modified *Ramey* test; Westrom's arguments on this issue lack merit.

V.

Westrom next claims that the circumstantial evidence was insufficient to support his convictions. When a conviction is based on circumstantial evidence, we apply a "two-step analysis" to decide whether the evidence is sufficient. *State v. Moore*, 846 N.W.2d 83, 88 (Minn. 2014). First, we identify the circumstances proved, winnowing down the evidence presented at trial to a subset of facts consistent with the jury's verdict, and disregarding evidence inconsistent with the verdict. *State v. Hassan*, 977 N.W.2d 633, 640 (Minn. 2022). Second, we independently examine the reasonable inferences that can be drawn from the circumstances proved, when viewed as a whole. *State v. Cox*, 884 N.W.2d

18

400, 412 (Minn. 2016). Circumstantial evidence is sufficient only if "the reasonable inferences are consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis other than guilt." *Hassan*, 977 N.W.2d at 640.

Here, the circumstances proved, when viewed as a whole, support a reasonable inference that Westrom murdered Childs and did so with premeditation. The circumstances proved are as follows: Childs was stabbed 65 times, with many of the stab wounds in vital areas of her body. Some of the wounds were inflicted after she died. Blood splatter and autopsy evidence showed that Childs' attacker pursued her across multiple rooms, targeted vital parts of her body, and kept stabbing her after she died. Westrom's DNA was present on several items in the areas where the attack occurred. Westrom left three bare footprints in Childs' blood while facing the window in her bedroom.

These circumstances proved support a reasonable inference that Westrom committed premeditated murder. *See, e.g.*, *State v. Fox*, 868 N.W.2d 206, 225–26 (Minn. 2015) (determining that 48 stab wounds to vital parts of the victim's body supported premeditation); *State v. Chomnarith*, 654 N.W.2d 660, 665 (Minn. 2003) (determining that the use of an industrial grade knife to inflict "precise wounds to vital areas" supported premeditation).

Westrom advances two hypotheses that are inconsistent with guilt. First, he claims that he could have "happened upon the murder scene, where there were footprints from other people and DNA from other men, when coming to visit the victim, in whose apartment his DNA had been deposited on a previous visit . . . and fled." Second, he argues that something could have triggered him to kill Childs in a "heat of passion."

19

But when the circumstances proved are viewed as a whole, neither of these hypotheses are reasonable. It strains credulity to conclude that Westrom simply happened upon the scene of the crime and chose to walk barefoot through Childs' blood to stand in front of the window—where her body lay on the floor next to him—and then leave. There is simply no set of reasonable inferences that could lead to this result. Was Westrom hypnotized into walking up to Childs' body? Was he directed at gunpoint to stand barefoot in her blood? The totality of the circumstances here "exclude beyond a reasonable doubt" both the ultimate and "intermediate" inferences which would have to be drawn to align Westrom's first hypothesis of innocence with the circumstances proved. *State v. Colgrove*, 996 N.W.2d 145, 155 (Minn. 2023); *id.* at 162 (Thissen, J., dissenting).

Westrom's second hypothesis, that he killed Childs in a heat of passion, fails because there is no evidence that suggests Westrom was "provoked" into the killing, as is required under a heat of passion defense. *State v. Johnson*, 719 N.W.2d 619, 627 (Minn. 2006). Because this hypothesis is not supported by any evidence in the record, it cannot be deemed a rational inference. *State v. Tscheu*, 758 N.W.2d 849, 858 (Minn. 2008) ("[The defendant] must . . . point to evidence in the record that is consistent with a rational theory other than guilt"). Accordingly, because the circumstances proved are consistent with an inference of guilt and inconsistent with any inference contrary to guilt, we conclude that there was sufficient evidence to convict Westrom of first-degree premeditated murder.

VI.

Westrom argues that he received ineffective assistance of counsel in violation of his constitutional rights. We use the test set out in *Strickland v. Washington* to evaluate

ineffective assistance of counsel claims. 466 U.S. 668, 687 (1984); *Leake v. State*, 737 N.W.2d 531, 536 (Minn. 2007). Under this test, a party must demonstrate that: (1) counsel's performance fell below an "objective standard of reasonableness"; and (2) there is a reasonable probability that, but for counsel's error, the outcome would have been different. *Strickland*, 466 U.S. at 669, 688. "We need not address both the performance and prejudice prongs if one is determinative." *State v. Rhodes*, 657 N.W.2d 823, 842 (Minn. 2003). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697. When a defendant shows that a conflict of interest "actually affected the adequacy of his representation," he "need not demonstrate prejudice in order to gain relief." *Gustafson v. State*, 477 N.W.2d 709, 713 (Minn. 1991) (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 349–50 (1980)) (internal quotation marks omitted). "But until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." *Id.* (citation omitted) (internal quotation marks omitted).

Here, Westrom claims that a personal interest of his trial lawyer led to a material limitation of his representation. But the record shows only that Westrom's trial counsel found it necessary to disclose a *possible* conflict of interest due to his prior representation of the district court judge's niece. That matter was "successfully completed in 2017." Here, the *State* was the party vulnerable to prejudice from the potential conflict of interest. Yet after learning that there was no overlap in the dates of representation, the State communicated to the judge that it had no further concerns. Because Westrom has not

21

demonstrated that his trial counsel had a personal interest that led to a material limitation of his representation, we conclude that his claim for ineffective assistance of counsel, based on conflict of interest, fails.

Westrom also alleges that other deficiencies by his trial counsel affected his representation. But even if trial counsel had acted as Westrom claims he should have—investigating J.C. as an alternative perpetrator sooner, objecting to the prosecutor's statements during closing arguments, and disclosing Dr. Nirenberg's second report in a timely fashion—it would not have changed the outcome of Westrom's case, for reasons we have given above. Thus, even if the performance of Westrom's trial counsel fell below an objective standard of reasonableness, he did not receive ineffective assistance because he was not prejudiced by his counsel's representation.

VII.

Westrom's final argument is that his convictions must be overturned due to errors that, "when taken cumulatively, had the effect of denying [him] a fair trial." *State v. Keeton*, 589 N.W.2d 85, 91 (Minn. 1998). Specifically, he points to five alleged errors that occurred at the district court: (1) failure to suppress DNA evidence; (2) exclusion of alternative-perpetrator evidence; (3) exclusion of the testimony of Dr. Nirenberg; (4) prosecutorial misconduct; and (5) ineffective assistance of counsel. But because we find the potential for error (and harmless error, at that) in only the exclusion of alternative-perpetrator evidence, there is no evidence of *cumulative* error here.

## VIII.

We also consider one issue not raised on appeal. We have previously addressed sua sponte the issue of a district court's error in entering judgments of conviction for both first-degree felony murder and second-degree intentional murder. *See State v. Cruz*, 997 N.W.2d 537, 556 (Minn. 2023). Under Minn. Stat. § 609.04, subd. 1 (2022), a defendant "may be convicted of either the crime charged or an included offense, but not both." "In Minnesota, every lesser degree of murder is an included offense." *State v. Zumberge*, 888 N.W.2d 688, 697 (Minn. 2017); *see also State v. Leinweber*, 228 N.W.2d 120, 125 (Minn. 1975). Here, the district court entered judgments of conviction for both first-degree felony murder and second-degree intentional murder after the jury returned guilty verdicts on both charges. Entering judgments of conviction on both of these murder charges was error. Accordingly, we remand to the district court to vacate the second-degree intentional murder conviction but otherwise leave the guilty verdicts in place.

## CONCLUSION

For the foregoing reasons, we affirm Westrom's conviction of first-degree premeditated murder but reverse and remand for the district court to vacate the second-degree murder conviction.

Affirmed in part, reversed in part, and remanded.